664 F.2d 435
 27 Fair Empl.Prac.Cas. 913,
27 Empl. Prac. Dec. P 32,328
UNITED STATES of America, Plaintiff-Appellee,
v.
The CITY OF MIAMI, FLORIDA, et al., Defendants-Appellees,
v.
FRATERNAL ORDER OF POLICE, CITY OF MIAMI LODGE NO. 20,
Kenneth R. Harrison, President, and the Miami
Police Benevolent Association,
Defendants-Appellants.
 No. 77-1856.
 United States Court of Appeals,
Fifth Circuit.*
 Dec. 3, 1981.
 
 Pelzner, Schwedock, Finkelstein & Klausner, Robert D. Klausner, Miami, Fla., for defendants-appellants.
 Brian K. Landsberg, Mildred M. Matesich, U. S. Dept. of Justice, Civ. Rights Div., Griffin B. Bell, U. S. Atty. Gen., Washington, D. C., Drew S. Days, III, U. S. Atty., Miami, Fla., David L. Rose, Squire Padgett, Dept. of Justice, Washington, D. C., for the U. S.
 George F. Knox, Jr., Miami, Fla., for City of Miami, Fla.
 Appeal from the United States District Court for the Southern District of Florida.
 Before GODBOLD, Chief Judge, BROWN, AINSWORTH, CHARLES CLARK, RONEY, GEE, TJOFLAT, HILL, FAY, RUBIN, VANCE, KRAVITCH, FRANK M. JOHNSON, Jr., GARZA, HENDERSON, REAVLEY, POLITZ, HATCHETT, ANDERSON, RANDALL, TATE, SAMUEL D. JOHNSON, THOMAS A. CLARK, and WILLIAMS, Circuit Judges.**
 PER CURIAM:
 
 
 1
 The en banc court has been unable to arrive at a majority consensus as to reasoning and result in this case. Those concurring in the opinion prepared by Judge Gee would, for the reasons stated there, grant broader relief to the Appellant Fraternal Order of Police and a wider remand than would those concurring in the opinion prepared by Judge Rubin. Since all concurring in either opinion referred to agree, however, that at least the relief mandated by Judge Rubin's opinion should be granted, and since no majority exists to grant broader relief, it is that mandate which becomes the order of the court by which the district court should be guided on the remand that we direct. Those concurring only in Judge Gee's opinion dissent from the failure of the court's mandate to reverse and remand more broadly. Separate opinions follow.
 
 
 2
 AFFIRMED IN PART and IN PART VACATED AND REMANDED.
 
 
 3
 ALVIN B. RUBIN, Circuit Judge, concurring in the Per Curiam, joined by BROWN, ANDERSON, RANDALL and THOMAS A. CLARK, Circuit Judges:
 
 
 4
 This case requires us to examine the circumstances under which, and the procedure by which, a court may enter a consent decree in a multiparty suit when some, but not all, of the litigants agree to the decree and parts, but not all, of the decree affect the rights of a nonconsenting party. We conclude that a decree disposing of some of the issues between some of the parties may be based on the consent of the parties who are affected by it but that, to the extent the decree affects other parties or other issues, its validity must be tested by the same standards that are applicable in any other adversary proceeding. Most parts of the decree entered by the trial court in this Title VII case pass the requisite muster, and we affirm them; however, because a part of the decree, entered without a trial, affects the rights of an objecting party, we limit its effect as to that party and remand for trial of the complaint insofar as a remedy is sought against that party.
 
 I. Commencement of the Litigation
 
 5
 The Attorney General filed a complaint against the City of Miami, several of its officials, and two organizations of police officers, the Fraternal Order of Police (FOP) and the Miami Police Benevolent Association (PBA), alleging that the defendants were engaged in policies and practices discriminating against black, Spanish-surnamed, and female individuals with respect to employment opportunities and conditions of employment with the City, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (1976), the fourteenth amendment to the Constitution of the United States, and 42 U.S.C. §§ 1981 and 1983. The complaint sought temporary and permanent injunctive relief.
 
 II. Attorney General's Authority
 
 6
 The FOP contends that the Attorney General lacked authority to institute the action, citing the 1972 amendments to Title VII, Equal Employment Opportunity Act of 1972, Pub.L.No.92-261, 86 Stat. 103 (codified in scattered sections of 42 U.S.C.), empowering the Equal Employment Opportunity Commission (EEOC) to file pattern or practice suits that the Attorney General previously had been empowered to file. 42 U.S.C. § 2000e-6(c).[1] The FOP contends that, after 1974,[2] only the EEOC could institute such actions against public employers; however, Congress has now explicitly authorized only the Attorney General to do so. Reorganization Plan No. 1 of 1978, § 5, reprinted in (1978) U.S.Code Cong. & Admin.News 9795, 9800 (prepared and transmitted pursuant to 5 U.S.C. §§ 901-912).
 
 
 7
 Applying the 1978 Reorganization Plan to pending litigation contradicts neither "statutory direction (n)or legislative history" and would not cause "manifest injustice." Bradley v. School Bd., 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476, 488 (1974). In accordance with decisions by both the Fourth and Ninth Circuits, therefore, we hold it applicable to this proceeding and affirm the Attorney General's authority to institute the action. United States v. Virginia, 620 F.2d 1018, 1022 (4th Cir.), cert. denied, 449 U.S. 1021, 101 S.Ct. 589, 66 L.Ed.2d 483 (1980); United States v. Fresno Unified School Dist., 592 F.2d 1088, 1093-94 (9th Cir.), cert. denied, 444 U.S. 832, 100 S.Ct. 62, 62 L.Ed.2d 41 (1979); United States v. North Carolina, 587 F.2d 625, 626 (4th Cir. 1978) (per curiam), cert. denied, 442 U.S. 909, 99 S.Ct. 2820, 61 L.Ed.2d 274 (1979).[3]
 
 III. Litigation History
 
 8
 Negotiations between the Attorney General and the City apparently preceded the filing of the complaint, for the day after it was lodged the City filed an answer denying the charges of discrimination. A month later the FOP and the PBA filed an answer denying the allegations of the complaint and raising thirteen affirmative defenses to which, shortly thereafter, they added a fourteenth. The FOP, as collective bargaining agent, represents all ranks in the City police force up to and including captain. The record discloses neither the function of the PBA nor why it was joined as a defendant, for it is not a collective bargaining agent,[4] nor why it should be enjoined by the court. Therefore, we hereafter refer only to the FOP as the party adverse to the relief now jointly sought by the United States and the City.
 
 
 9
 On February 18, 1976, the United States and the City filed a proposed consent decree signed by both. This decree was approved by the district court over objections to its entry by the FOP.
 
 
 10
 Nine days later, the FOP filed a motion to vacate the decree. After hearing argument on the motion, the court vacated the decree on April 2, stating that it was "improvidently signed" because some of the activities that it required of the City violated some of the provisions of the collective bargaining agreement between the City and the FOP. The district judge thought that all the parties might be able to reach an accord, for he directed that all of them attempt to arrive at another agreement. If there still remained unreconciled differences, then he would have "another hearing to see whether or not (the decree) does interfere" with the collective bargaining agreement. Discovery had been stayed, but, at the FOP's request, the protective order staying discovery was lifted on August 18. Thereafter the City and the Attorney General answered most of the FOP's interrogatories.[5]
 
 
 11
 On September 30, the contract between the City and the FOP expired. By December, negotiators for the City and the FOP had agreed to renew the contract, with some modifications, retroactive to October 1. This modified contract had been ratified by the Union, but it had not yet been signed by the City.
 
 
 12
 On November 17, the Attorney General and the City filed a motion to reinstate the consent decree, accompanied by an affidavit that the FOP and the City had been unable to resolve their differences; a stipulation containing statistics showing the composition both of the labor force in Miami and of the City's work force; a statement that the City Civil Service Board used unvalidated competitive examinations in making most of its hiring and promotion decisions; and statements that the City had received and was then receiving funds under the State and Local Fiscal Assistance Act of 1972 and the Omnibus Crime Control and Safe Streets Act of 1968.[6]
 
 
 13
 On December 13, the court held "a hearing on a motion for Re-entry (sic)." The judge started the hearing by asking the FOP to state its objections to the proposed decree. The FOP then stated a number of reasons why it contended that the proposed decree was invalid, all of them based on its asserted violation of the FOP's rights or the Federal Constitution. The FOP urged, for example, that the decree would discriminate against whites; that it instituted a quota system; that it violated the union contract because it permitted promotions without following the civil service testing procedure; that it was not signed by the City Manager and had not been approved by the City Council; that its provisions for deferment of pensions (now deleted, see p. 439 infra) violated the union contract; and that it improperly forbade the City Civil Service System to continue to use "unvalidated" tests. Although the FOP urged that the court conduct a "full-blown trial," it mentioned no evidence that it would introduce at such a trial; it proffered no evidence and did not attempt to controvert in any way the stipulation between the United States and the City.
 
 
 14
 Although the record is not explicit, apparently the FOP was asking that the court require the Attorney General to try his complaint against the City, and did not seek to introduce any evidence that would negate the Attorney General's claims. It argued instead the unconstitutionality of the proposed decree in toto, the decree's invalidity for legal defects, and the impropriety of enforcing the decree against the FOP without a trial between the City and the Attorney General.
 
 
 15
 To allay some of the concerns expressed by the court at the December hearing, the City and the Attorney General submitted modifications to the proposed decree. These modifications deleted, inter alia, the proposals relating to pensions. A hearing on the modified proposed decree was held on February 8, 1977. We assume that meanwhile the City and the FOP had executed the new collective bargaining agreement, although the record is silent on this subject.
 
 
 16
 The judge and all of the parties were aware of, and the record contains frequent reference to, a suit recently concluded in another division of the same court, Cohen v. City of Miami, No. 71-1887-Civ-CA (S.D.Fla., final judgment May 6, 1974). In Cohen, the City agreed, in settlement of a class action against it, to validate the entry and promotional examinations for its police department and to recruit and hire more members of minority groups for its police department; however, the tests had not yet been validated.
 
 
 17
 On March 29, the court entered the modified decree proposed by the City and the Attorney General and still opposed by the FOP. The court found that the decree "does not violate the contractual relationship between the City of Miami and the Fraternal Order of Police and the Miami Police Benevolent Association." It found further: "The consent reached is constitutionally valid. It should be recognized by the Court." Although the City's supplemental memorandum, filed with its application for reentry of the consent decree, had stated that the complaint and the consent order did not allege wrongdoing by or request relief for defendant police unions, the court order further stated:
 
 
 18
 Because the Consent Decree contains the following injunctive order (permanent in nature):
 
 
 19
 "1. The defendant City of Miami ... and all persons in active concert or participation with them ... are permanently enjoined and restrained from engaging in any act or practice which has the purpose or effect of unlawfully discriminating against any employee of, or any applicant for employment with, the City of Miami because of such individual's race, color, sex or national origin ..."
 
 
 20
 the Fraternal Order of Police and the Police Benevolent Association will not be dismissed as parties to the action.
 
 
 21
 The FOP appealed. A panel of this court affirmed the district court. 614 F.2d 1322 (5th Cir. 1980). We granted a petition to rehear the case en banc, 625 F.2d 1310 (5th Cir. 1980), thus vacating the panel opinion, 5th Cir. R. 17.
 
 IV. Consent Decrees
 
 22
 The parties to litigation may be compromise and settlement not only save the time, expense, and psychological toll but also avert the inevitable risk of litigation. United States v. Armour & Co., 402 U.S. 673, 681, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256, 262 (1971). If the parties agree to compose their differences by a settlement agreement, however, the only penalty for failure to abide by the agreement is another suit. Litigants, therefore, have sought to reinforce their compromise and to obtain its more ready enforceability by incorporating it into a proposed consent decree and seeking to have the court enter this decree.
 
 
 23
 A consent decree, although founded on the agreement of the parties, is a judgment. United States v. Kellum, 523 F.2d 1284, 1287 (5th Cir. 1975). It has the force of res judicata, protecting the parties from future litigation. It thus has greater finality than a compact.[7] As a judgment, it may be enforced by judicial sanctions, including citation for contempt if it is violated.[8]
 
 
 24
 The entry of a consent decree necessarily implies that the litigants have assented "to all of its significant provisions." High v. Braniff Airways, Inc., 592 F.2d 1330, 1334 (5th Cir. 1979). In this respect a consent decree is akin to a contract, to be interpreted in the same manner. United States v. ITT Continental Bakery Co., 420 U.S. 223, 236-37 & n.10, 95 S.Ct. 926, 934 & n.10, 43 L.Ed.2d 148, 161 & n.10 (1975).[9]
 
 
 25
 Complete accord on all issues, however, is not indispensable to the entry of any order. Even in a two-party litigation the parties may agree on as much as they can, ask the court to incorporate that agreement into a consent decree, and call upon the court to decide the issues they cannot resolve. See Pettway v. American Cast Iron Pipe Co., 576 F.2d 1157, 1168-75 (5th Cir. 1978), cert. denied, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979); High v. Braniff Airways, Inc., 592 F.2d at 1334-35. Thus, there may be a decree "partially consensual and partially litigated." Id. at 1335. We made such an analysis in Pettway, in which we held that a judgment in a class action case was a hybrid, based in part on the parties' settlement agreement and in part on the court's own judgment. 576 F.2d at 1175.
 
 
 26
 Applying the same principle to multiparty litigation, two parties may resolve all of the issues that do not affect a third party, ask the court to include only this settlement in a consent decree, and submit to the court for adjudication the remaining issues, disputed between them and the third party. If the court then enters a decree, it is similarly hybrid. We must review each part of the decree by separate standards, both in determining appealability and in deciding its substantive merit.
 
 
 27
 Whether complete or partial, the agreement of the parties is not equivalent to a judicial decision on the merits. It is not the result of a judicial determination after the annealment of the adversary process and a judge's reflection about the ultimate merits of conflicting claims. It does not determine right and wrong in the initial dispute. Forged by the parties as a compromise between their views, it embodies primarily the results of negotiation rather than adjudication. United States v. City of Jackson, 519 F.2d at 1151-52.
 
 
 28
 Nonetheless, the parties who agree on a consent decree are not mere supplicants for court favor. The parties have a right to compromise their dispute on mutually agreeable terms, and these terms may include the incorporation of their settlement into a judicial decree. See Carson v. American Brands, Inc., 450 U.S. 79, 84, 101 S.Ct. 993, 998, 67 L.Ed.2d 59, 66 (1981). In United States v. City of Alexandria, 614 F.2d 1358 (5th Cir. 1980), we reversed a trial court for refusing to enter a consent decree in a Title VII case, stating:
 
 
 29
 a consent decree proposed by a private defendant and government agency in an employment discrimination case carries with it a presumption of validity that is overcome only if the decree contains provisions which are unreasonable, illegal, unconstitutional, or against public policy.
 
 
 30
 Id. at 1362.
 
 
 31
 The court, however, must not merely sign on the line provided by the parties. Even though the decree is predicated on consent of the parties, the judge must not give it perfunctory approval. As Professors Moore and Currier state:
 
 
 32
 (T)he judgment is not an inter partes contract; the court is not properly a recorder of contracts, but is an organ of government constituted to make judicial decisions and when it has rendered a consent judgment it has made an adjudication.
 
 
 33
 1B Moore's Federal Practice P 0.409(5), at 1030 (2d ed. 1980).
 
 
 34
 When presented with a proposed consent decree, the court's duty is akin, but not identical to its responsibility in approving settlements of class actions,[10] stockholders' derivative suits,[11] and proposed compromises of claims in bankruptcy.[12] In these situations, the requisite court approval is merely the ratification of a compromise. The court must ascertain only that the settlement is "fair, adequate and reasonable."[13]
 
 
 35
 Because the consent decree does not merely validate a compromise but, by virtue of its injunctive provisions, reaches into the future and has continuing effect, its terms require more careful scrutiny. Even when it affects only the parties, the court should, therefore, examine it carefully to ascertain not only that it is a fair settlement but also that it does not put the court's sanction on and power behind a decree that violates Constitution, statute, or jurisprudence. This requires a determination that the proposal represents a reasonable factual and legal determination based on the facts of record, whether established by evidence, affidavit, or stipulation. If the decree also affects third parties, the court must be satisfied that the effect on them is neither unreasonable nor proscribed.[14]
 
 
 36
 In assessing the propriety of giving judicial imprimatur to the consent decree, the court must also consider the nature of the litigation and the purposes to be served by the decree. If the suit seeks to enforce a statute, the decree must be consistent with the public objectives sought to be attained by Congress. Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights, 616 F.2d at 1014. Voluntary compliance will frequently contribute significantly toward ultimate achievement of statutory goals. Patterson v. Newspaper & Mail Deliverers' Union, 514 F.2d 767, 771 (2d Cir. 1975), cert. denied, 427 U.S. 911, 96 S.Ct. 3198, 49 L.Ed.2d 1203 (1976). Defendants "minimize costly litigation and adverse publicity and avoid the collateral effects of adjudicated guilt." United States v. City of Jackson, 519 F.2d at 1152 n.9. Therefore, willing compliance will be more readily generated by consent decrees than would mandates imposed at the end of bitter and protracted litigation. Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights, 616 F.2d at 1014.
 
 
 37
 Voluntary settlement of Title VII suits was deliberately adopted by Congress as a means of accomplishing its goal of eliminating employment discrimination. "Cooperation and voluntary compliance were selected as the preferred means of achieving this goal." Alexander v. Gardner-Denver Co., 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147, 156 (1974); see Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir. 1977). Quoting Alexander, the Supreme Court recently noted that a court's refusal to approve a consent decree in a Title VII case is an appealable order because, in part, the refusal undermines one of the policies supporting Title VII by denying the parties the opportunity to compromise their claims and to obtain the prompt injunctive benefits of the settlement agreement they have negotiated. Carson v. American Brands, Inc., 450 U.S. at 84 & n.14, 101 S.Ct. at 998 & n.14, 67 L.Ed.2d at 66 & n.14.
 
 
 38
 A consent decree may properly include provisions requiring the defendant to take affirmative action rectifying the effects of past discrimination. Regents of the Univ. of Cal. v. Bakke, 438 U.S. 265, 301-02 & n.41, 98 S.Ct. 2733, 2754 & n.41, 57 L.Ed.2d 750, 779 & n.41 (1978) (Powell, J., announcing the judgment of the Court). Although this opinion reflects Justice Powell's views, the separate opinion of Justices Brennan, White, Marshall, and Blackmun indicates agreement with this portion of the opinion. In view of the tacit admission of the City in proposing the consent decree, the employment goals and other remedial actions required by it are in accordance with the policy of Title VII and do not deny others equal treatment.
 
 
 39
 Like other judicial functions, the decision to approve a consent decree requires careful consideration and the exercise of discretion. The district court's approval of a proposed settlement by consent decree should be reversed only if its approval is an abuse of the court's discretion. See Young v. Katz, 447 F.2d 431 (5th Cir. 1971).[15]
 
 
 40
 Our analysis of the record, set forth more fully below, leads ineluctably to the conclusion that the consent decree between the United States and the City was a hybrid decree: in what was essentially a three-party suit, only two parties consented to the decree. Insofar as the decree does not affect the nonconsenting party and its members, or contains provisions to which they do not object, the trial court properly exercised its discretion in approving it. However, parts of the decree do affect the third party who did not consent to it, and these parts cannot properly be included in a valid consent decree.
 
 V. Analysis of the Decree
 
 41
 The decree in full is set forth as an appendix to the panel opinion. 614 F.2d at 1342-51. Reviewing its provisions and the FOP's objections to it, both as stated in the trial court and in its briefs to us, we find that few of its provisions affect the FOP as an organization or its members, and that most of these are so patently an application of Title VII, as the law of the land, that the FOP has not even suggested an opposition to them.
 
 
 42
 The first paragraph of the decree enjoins the City from engaging in any act or practice that unlawfully discriminates against any employee, applicant, or potential employee. The FOP does not object, nor indeed could it have valid objection, to a provision that orders the City to do nothing unlawful.
 
 
 43
 The second and third paragraphs of the decree relate to new employees. Paragraph 2 concerns recruitment. In addition to general affirmative action goals, it prescribes specific programs for recruiting personnel for the police and fire departments. Paragraph 3 deals with selection of new employees, including testing, education, background investigation, medical examination and physiological qualifications, criminal record, and polygraph examination. Except for testing, the provisions of this paragraph relate only to initial employment.
 
 
 44
 The FOP represents only members of the police force below major's rank. Neither its collective bargaining agreement nor the Miami Civil Service Ordinance[16] gives it any voice in hiring either police officers or other municipal employees. The provisions of the decree that relate to hiring therefore do not affect the FOP or present employees of the police department. Moreover, in its several briefs to us, the FOP has never objected to the hiring goals.
 
 
 45
 Paragraph 2 does contain a sentence forbidding the City to use "any written examination for employment or promotion which has an adverse impact on blacks, Latins or women unless it can be shown to be predictive of successful job performance, or can otherwise be shown to be job related," except that the City may continue to use such tests "during the time they are being validated, in accordance with" EEOC Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. §§ 1607.1 to .18 (1980). The FOP insists upon adherence to present testing procedures for promotion and objects to the time required for the validation of examinations.[17] We will consider these objections in discussing paragraph 7, which deals with promotions. However, except for the effect of testing on police department promotions, this paragraph of the decree does not affect the FOP.
 
 
 46
 Paragraph 4, paraphrasing § 703(a)(2) of Title VII, 42 U.S.C. § 2000e-2(a)(2), forbids the City to discriminate on the basis of race, sex, or national origin in the assignment of employees in any department except as permitted by EEOC Guidelines on Discrimination Because of Sex, 29 C.F.R. §§ 1604.1 to .11 (1980), EEOC Guidelines on Discrimination Because of National Origin, id. § 1606.1, and the Office of Revenue Sharing, Department of the Treasury regulation on employment discrimination, 31 id. § 51.53. These provisions affect the relationship of the City with all of its employees alike. They merely state settled federal statutory requirements and the FOP registers no objection to them.
 
 
 47
 Goals are fixed by paragraph 5, in which the decree recites: "In order to eliminate the effects of past discriminatory practices against blacks, Latins and women, the City shall adopt and seek to achieve as its long term goal the participation at all levels throughout its work force of blacks, Latins and women approximating their respective proportions in the City's labor force ...." (Emphasis supplied.) The City agrees that this statement constitutes a tacit admission of past discrimination. Hiring goals are then set in the remainder of this paragraph. As we have already pointed out, the FOP agreement is silent about hiring. Paragraph 5 also contains provisions concerning establishment of promotional goals. Insofar as these affect the FOP, we will discuss them in connection with paragraph 7.
 
 
 48
 Paragraph 6 defines the affected class; paragraph 9 concerns the records the City agrees to keep; paragraph 10 requires the City to report specified employment data; paragraph 11 requires the City to post the court order and to designate a City EEO officer; and paragraph 12 contains definitions. These paragraphs affect FOP employees only indirectly, if at all. They do not transgress any part of the FOP's collective bargaining agreement, and the FOP has neither objected to them nor alleged any impropriety in their inclusion in a court order.
 
 
 49
 Paragraph 8 requires the City to provide a fund for payment of backpay in an amount to be determined by negotiation between the Attorney General and the City. Persons entitled to backpay will be offered an amount to be determined by those negotiations. No person having a claim for backpay is precluded from separately asserting it. In the trial court the FOP complained, apparently pro bono, that this provision might enable the City to escape liability to persons who had been discriminated against. It did not allege that it represented any person whose rights would be affected. It did not repeat these objections in the briefs filed in this court.
 
 
 50
 The one part of the consent decree that the FOP contends both affects its members and violates its contract is a clause in paragraph 7, dealing with promotions, that provides for promotion of members of the affected class. This clause does alter prior practice and we will discuss it separately.
 
 
 51
 Save for its provisions concerning the selection of persons to be promoted, however, the decree for the most part does not affect FOP-represented persons, that is, it affects only how the City will hire all of its employees and how it will treat the 80% of its employees who work in other departments. In various indirect ways, neither objected to nor alleged to violate the FOP contract, the decree may affect police officers in the same general way it affects others. The FOP does not complain of the provisions, for example, concerning reporting requirements or the designation of an EEO officer.
 
 
 52
 Insofar as the decree affects only the employees of other departments, the FOP lacks standing to appeal its provisions, for reasons we shall more fully elaborate. In any event, those provisions of the decree that affect only the 80% of the City's employees who are not represented by the FOP and, in addition, those provisions that affect police officers but are not objected to by the FOP, are to be weighed as a consent decree in accordance with the standards we have set forth in Part IV, supra. We do not review the trial court's decision de novo, but as an appellate court, to determine whether the judgment of the trial judge should be set aside.
 
 
 53
 In assaying the weight to be given the trial judge's decision, we measure the facts in the record before him; the degree to which he demonstrated familiarity with the issues, the parties, and the applicable law; the reasonableness and fairness of his decision; and the constitutional and statutory arguments both for and against the validity of his decision. See id. The record demonstrates that the trial judge did not merely put pen to the parties' paper. He heard full argument three times. The United States and the City stipulated data that supported the inference of past discrimination, and they agreed to a statement in the text of the decree that the City had discriminated against blacks, Latins, and women. Cf. Alexander v. Bahou, 86 F.R.D. 194, 199 (N.D.N.Y.1980) (court presented with data but no admission of liability). The trial judge vacated the decree first proposed to and accepted by him, then later insisted upon its modification. He gave the FOP ample opportunity to muster its objections and considered its arguments fully. Under these circumstances, his approval of the decree, insofar as it affected City employees other than FOP members and, patently, insofar as it is not objected to by the FOP, must be affirmed.
 
 VI. Appellate Jurisdiction
 
 54
 Although no party challenges either our jurisdiction or the intermeshed question of standing to appeal the decree, we have, as we are obligated to, e. g., Alabama ex rel. Baxley v. Woody, 473 F.2d 10, 12-13 (5th Cir. 1973), considered these questions. We discuss them at this point rather than at the outset of our opinion, the usually logical place, because they can be more readily answered with full comprehension of the nature of the litigation and the disputed issues.
 
 
 55
 An order entering a consent decree containing an injunction is appealable by any party adversely affected. 28 U.S.C. § 1292(a)(1) provides jurisdiction over appeals from "(i)nterlocutory orders of the district courts of the United States ... granting, continuing, modifying, refusing or dissolving injunctions." Recently, in Carson v. American Brands, Inc., a unanimous Supreme Court determined that a consent decree enjoining an employer from discriminating against its black employees was an "injunction" for purposes of § 1292(a)(1). Here, as in Carson, the decree has the "practical effect" of an injunction, 450 U.S. at 83, 101 S.Ct. at 996, 67 L.Ed.2d at 65, as it enjoins future discrimination and mandates remedies for past discrimination. If, as the Court held, a district court's refusal to enter a decree was an appealable order, then entry of this decree, "granting (an) injunction," must also be appealable under § 1292(a)(1). Roberts v. St. Regis Paper Co., 653 F.2d 166, 169-170 (5th Cir. 1981).[18]
 
 
 56
 An appealable order may not, however, be challenged by the world at large or even by every party to the suit in which it is entered. To have standing, a party must be aggrieved by the judicial action from which it appeals. Deposit Guar. Nat'l Bank v. Roper, 445 U.S. 326, 333-34, 100 S.Ct. 1166, 1171, 63 L.Ed.2d 427, 436-37 (1980).[19] Except in class actions, under Fed.R.Civ.P. 23, an appellant may not appeal on behalf of others who have chosen not to intervene or to appeal. See Machella v. Cardenas, 653 F.2d 923, 927 (5th Cir. 1981); Bogus v. American Speech & Hearing Ass'n, 582 F.2d 277, 291 (3d Cir. 1978).
 
 
 57
 Consequently, the FOP cannot challenge provisions of the decree that affect only the City and municipal employees outside the police department or applicants for positions in the police department who, while affected by the hiring goals in the decree, are not members of the FOP.[20] Because no other affected party has come forward to challenge these portions of the decree, our inability to consider objections by the FOP leaves them in force. Compare Kincade v. Jefferey-DeWitt Insulator Corp., 242 F.2d 328, 331 n.5 (5th Cir. 1957) with 1B Moore's Federal Practice P 0.416(3), at 2253 (2d ed. 1980) and 7 id. P 60.25(2), at 297 (2d ed. 1979).
 
 
 58
 The FOP has not objected to some portions of the decree that affect its members, for example, paragraph 1, forbidding discrimination. Therefore, because these issues were neither raised in the trial court nor briefed on appeal, we do not consider them. Waganer v. Sea-Land Serv., Inc., 486 F.2d 955, 959 (5th Cir. 1973); Burns v. Travelers Ins. Co., 344 F.2d 70, 72-73, 75 (5th Cir. 1965); Martin v. Atlantic Coast Line R.R., 289 F.2d 414, 417 & n.5 (5th Cir. 1961).
 
 
 59
 VII. Parts of the Decree Adversely Affecting the FOP
 
 
 60
 We turn then to those parts of the decree that adversely affect the FOP and its membership.
 
 
 61
 Paragraph 5(b), discussed infra, alters the manner in which policemen are promoted. The FOP contract is silent on promotions; however, in Article XXX, entitled "Prevailing Benefits," the 1974-76 contract provided:
 
 
 62
 All job benefits in effect at the time of the execution of this (A)greement heretofore authorized by the City Manager or benefits provided for by ordinances of the City Commission, not specifically provided for or abridged by this (A)greement, shall remain in full force and effect for the duration of this Agreement.
 
 
 63
 The City and the Employee Organization will meet at the request of the City to negotiate any proposed changes in those rights and benefits not specifically covered by this Agreement, provided however no changes shall be made except by mutual consent and any impasse shall not be subject to the Impasse Resolution as provided for in (the Agreement).
 
 
 64
 The Miami Civil Service Ordinance, referred to in the briefs and the record, and of which we consequently take judicial notice,[21] provided, at the time the decree was entered, that eligibility for promotion was determined solely on the basis of the employee's score on a civil service test.
 
 
 65
 The categorical language of Article XXX implies that the parties intended all provisions of the ordinance favorable to the FOP, including its provisions concerning promotions, to be covered and protected by the agreement. Although Article VI of the agreement, cited by the parties to the consent decree, reserves to the City "the right to hire ... (and) promote," that article later states that the City may not "violate the City Charter or the Civil Service Rules and Regulations," presumably including the regulations on the procedures governing promotion of police officers. Under Florida law, promotion is a subject for collective bargaining by public employees. See Manatee County v. Florida Pub. Employees Relations Comm'n, 387 So.2d 446, 452 (Fla.Dist.Ct.App.1980). Compare Fla.Stat.Ann. § 447.309(1) (West 1981) and T. Kheel, Labor Law § 54.03 (1977) with R. Gorman, Labor Law 503 (1976).
 
 
 66
 The FOP contends that the restriction of promotion to persons on the eligible list is a job benefit provided for by this ordinance, that the decree deprives its members of that benefit, and that the contract prevents the City from altering the ordinance without its consent. The consent decree, indeed, provides in paragraph 7(b)[22] that, in filling vacancies, a member of the affected class is to be given the initial opportunity if that applicant has the greatest seniority in City employment and "meets, or could reasonably be expected to meet after an initial probationary period, the minimum qualifications for the position unless an applicant not a member of the affected class has demonstrably superior qualifications." This makes it possible for a person in the affected class to receive a promotion, in preference to a person who had passed the civil service test, without even taking the test. Thus, FOP members who seek promotion on the basis of test scores have been threatened with the requisite "injury in fact," Lipscomb v. Wise, 643 F.2d at 320, so they "retain( ) a stake in the appeal satisfying the requirements of Art. III," Deposit Guar. Nat'l Bank v. Roper, 445 U.S. at 333-34, 100 S.Ct. at 1171, 63 L.Ed.2d at 436-37. To this extent, we find erroneous the trial court's determination that the decree does not affect the contractual relationship between the City and the FOP.
 
 
 67
 The right to promotion on the basis of test accomplishment may not be obliterated without a demonstration that the City has, in making promotions, discriminated against members of the affected classes in the past and that affirmative action is a necessary or appropriate remedy or that it has so discriminated in employment policy as to unfairly prejudice the opportunity of the affected class to achieve promotions. See Detroit Police Officers' Ass'n v. Young, 608 F.2d 671, 696 (6th Cir. 1979), cert. denied, --- U.S. ----, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1981).[23]
 
 
 68
 The contract modifies the City's legislative power to amend its ordinance but such a contract appears to be valid under Florida law. The Florida cases hold that, when a subject is encompassed within the terms of an existing contract, a public employer may not foreclose bargaining on the subject or unilaterally alter the terms and conditions of employment. See School Bd. v. Indian River County Educ. Ass'n Local 3617, 373 So.2d 412 (Fla.Dist.Ct.App.1980); School Bd. v. Palowitch, 367 So.2d 730, 731 (Fla.Dist.Ct.App.1979). Our reading of the Florida public employees' collective bargaining statute, Fla.Stat.Ann. § 447.309 (West 1981), and the Florida judicial decisions that have thus far considered it leads us to the conclusion that the collective bargaining agreement is permitted to circumscribe the legislative power of the public agency.[24] Were this not so, its provisions would be meaningless; for the quintessence of a collective bargaining agreement with a public employer is that it limits the public employer's legislative prerogatives. See 10 T. Kheel, Labor Law §§ 52.02, .03 (1977). Although we do not pretermit reexamination of these matters on remand, in the absence of either a trial or an examination of them by the district court, we are not prepared to hold that the consent decree is valid insofar as it deprives the FOP and its members of the benefit of the promotion procedure that was in effect a part of the FOP contract with the City. If, on remand, the United States shows that the City's practices have discriminated against individuals in or members of the affected class in such a way as adversely to affect their promotions, the district court shall fashion an appropriate remedy invoking its "sound equitable discretion." Franks v. Bowman Transp. Co., 424 U.S. 747, 770, 96 S.Ct. 1251, 1267, 47 L.Ed.2d 444, 464 (1976). See also Fullilove v. Klutznick, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980).
 
 VIII. Conclusions
 
 69
 A party potentially prejudiced by a decree has a right to a judicial determination of the merits of his objection. The party is prejudiced if the decree would alter its contractual rights and depart from the governmental neutrality to racial and sexual differences that is the fundament of the fourteenth amendment in order to redress past discrimination. Those who seek affirmative remedial goals that would adversely affect other parties must demonstrate the propriety of such relief.
 
 
 70
 However, the parties to litigation are not to be deprived of the opportunity to compose their differences by objections that find no basis in prejudice to the objector. Voluntary compliance with congressional objectives should not be defeated merely by the contumacy of one who has no true stake in the controversy.IX. Mandate
 
 
 71
 No reason has been shown for the district court's failure to dismiss the PBA from the litigation. As to it, the decree is reversed, and the district court is ordered to dismiss it from the litigation.
 
 
 72
 The provisions of the court's decree shall be modified to provide that it does not affect the promotion of members of the Police Department. As thus restricted, we affirm its reentry upon remand. The case is remanded, in addition, for further proceedings, consistent with this opinion, to determine whether the United States has the right to claim any relief concerning police promotion. If, at trial, the United States can prove that the City has discriminated against black, Spanish-surnamed, or female police officers, or that the City has so discriminated in its employment policy as to prejudice their opportunities for promotion, and that affirmative action in favor of the affected class is appropriate remedial action, the United States may seek such relief, including reimposition of the contents of paragraph 5(C). The FOP shall, of course, be afforded the opportunity either to contend that discrimination, the necessary predicate for relief, has not been proved, or to show that the type of relief embodied in paragraph 5(c) is, in this instance, unnecessary, inadvisable, or unconstitutional.
 
 
 73
 Costs of the appeal are to be divided.
 
 
 74
 GEE, Circuit Judge, concurring in part and dissenting in part, joined by CHARLES CLARK, AINSWORTH, RONEY, JAMES C. HILL, FAY, VANCE, GARZA, HENDERSON, REAVLEY and POLITZ, Circuit Judges:
 
 
 75
 The procedural and factual background of this case are set out at length in the panel opinion. 614 F.2d 1322. Little of this need be repeated for our present purposes, since in our view the appeal is disposed of by a rule both elementary and procedural: a nonconsenting party may not be subjected to a permanent injunction without a trial on the merits of his case.[1] Two of the parties to this litigation, the plaintiff United States and the defendant City of Miami, settled their differences and executed a proposed consent decree. The court below imposed that settlement on the unconsenting union without so much as a setting for trial on the merits. Such a procedure was improper.
 
 The Factual Setting
 
 76
 As the year 1975 closed, the United States filed this Title VII "pattern and practice" suit against the City of Miami and others, among them the city police officers' union and collective bargaining agent, Fraternal Order of Police ("FOP").[2] The city answered the following day, the union in normal course. The course of the litigation thereafter consisted exclusively of attempts by the city and the United States to persuade the court to enter a lengthy consent decree arrived at between them, one that imposed racial and other hiring and promotion quotas on the city, and of the resistance of the FOP to these proposals.[3] The case was never set for trial on the merits, nor was any such trial ever held. At last the court entered the decree over the union's protest, without a trial.
 
 
 77
 In its answer, among other contentions, the FOP pled that the quotas of the proposed decree discriminated unconstitutionally on the bases of race and sex and that the city's agreement to the decree's provisions violated the collective bargaining relationship that it, as a union, maintained with its municipal employer.
 
 
 78
 Early in the case, the court had entered the consent decree. When the union moved to set it aside, the court held a hearing and thereafter set aside the decree as improvidently entered. Further sparring between the union and the consenting parties ensued, interrogatories were sent and answered, and the usual procedures of preparation for trial went forward. In their course, the court directed the union to compile a list of those points wherein it claimed its existing collective bargaining contract with the city was infringed by the consent decree. We can find no indication in the record that it ever did so. For this dereliction it was to pay a heavy price.
 
 
 79
 Whether, however, this failure of the union to point out wherein the decree contravenes any provision of its existing agreement with the city is dispositive of the collective bargaining issue in this case is unclear under Florida law.[4] Had the court below directly addressed this issue, or had it been briefed on its merits, we might attempt to resolve it. Being in serious doubt, as we are, we should more likely have certified the question to the patient and long-suffering Supreme Court of Florida.[5] None of this, however, took place, the court below having simply disregarded the issue.
 
 
 80
 Instead, while the case was in the discovery process, the court set and held yet another hearing, this one to determine whether it should reenter the voided consent decree with minor changes.[6] Counsel for all parties appeared and argued at length about the decree, about some of its various provisions, and about whether the court could properly enter it without the consent of the union parties. No one was in any doubt at all about the nature of this proceeding or indicated any misapprehension that it was in any sense intended as a trial of the merits. Rather the contrary: near the end of the hearing, at pages 104-05 of the 129-page transcription of it, Mr. Padgett, counsel for the United States, characterized the proceeding as follows:
 
 
 81
 (I)f we had ever gone to trial we would have done our best to ask for whatever the total amount of liability was, okay.
 
 
 82
 Let's not mistake that.
 
 
 83
 If we were in a full-blown trial, but we are not in a full-blown trial and we are attempting to resolve the matter by consent.
 
 
 84
 (Emphasis added).
 
 
 85
 And on the last two pages, 128 and 129, the court and counsel for the union had this final exchange:
 
 
 86
 He (Mr. Weinsoff, counsel for the union) says that there are conflicts in the contract as presently proposed and accepted by the people, between that and this decree, right, and further he says that being a named defendant in here, he has got a right to raise the proposition that everything you fellows have done discriminates against everybody who has vested interest, including whites, and that the Court simply ought not to accept a decree which is discriminatory in its effect.
 
 
 87
 All right?
 
 
 88
 MR. WEINSOFF: Your Honor, it would be tantamount to imposing Rule 56 summary judgment on us and you already indicated there is outstanding issues of fact and law.
 
 
 89
 (Emphasis added).
 
 
 90
 Following the hearing, the parties filed cross-memoranda with the court, the unions continuing to protest the apparent intention of the court to subject it to the consent decree without a trial:
 
 
 91
 This Court should not sign an injunction without a hearing at which the parties may reasonably be given an opportunity to present evidence on their behalf and where the burden of proof lies upon the Plaintiff to convince the Court that the Defendants and each and every one of them have in fact committed acts in violation of the laws sought to be enforced and that these violations are contrary to law and that there is no relief available to the Plaintiff other than the injunction and the violations are continuing, thereby causing irreparable harm to the Plaintiff or those to whom they are entitled to sue on behalf of.
 
 
 92
 The United States and the City of Miami, in addition to ascertaining a way in which there would be finality of judgment against the Defendants, Police Benevolent Association and Fraternal Order of Police, must show that there are findings of fact entitling the issuance of an injunction. Without findings of fact and conclusions of law, an appeal from this Consent Decree would be futile thereby depriving the Defendants the right to appeal to a higher Court for relief from the Order.
 
 
 93
 The Consent Decree states that the parties have waived hearing and the entry of findings of fact and conclusion of law of all issues covered by this Consent Decree, page one. The Respondents did not waive hearing, the entry of findings of fact and conclusion of law and never have intimated such. The injunction is only one portion of the Consent Decree and does not deal with each and every aspect of the Consent Decree. Therefore, the injunction portion of the Consent Decree would be the only issue that would be appealable and that is not an appealable order for the entire Consent Decree.
 
 
 94
 The second point raised by the joint movants is the Consent Decree does not allege wrong doing or request relief against Defendant Police units. Once the United States sued the Respondents and made them a part of the action, the Respondents had an interest in the case on behalf of its members which they must protect even though the City will consent to the Decree.
 
 
 95
 The relief in the Consent Decree violates the contractual rights of the Respondents and also the Civil Service Laws of the City of Miami which are carried forth into the contract between the Respondents and the City of Miami by virtue of the "prevailing rights clause" of 1974-76 contract and which is again carried forth in the 1976-78 contract. The entry of the Consent Decree should not change the obligations between the parties without a hearing on the merits and the Court would in effect be rewriting the Collective Bargaining Agreement between the City of Miami and the Fraternal Order of Police which the Court has no power to do until due process has been satisfied, to-wit: Notice of Hearing and an opportunity to present evidence on behalf of the Respondents.
 
 
 96
 (Emphasis added). Nevertheless, the court proceeded to reenter the consent decree despite the union's protests. In addition, and though no trial had been had, the court entered what it termed "Findings and Conclusions," in pertinent part as follows:
 
 
 97
 The Court now finds that the Consent Decree in its present form and under the present circumstances, does not violate the contractual relationship between the City of Miami and the Fraternal Order of Police and the Miami Police Benevolent Association.
 
 
 98
 The consent reached is constitutionally valid. It should be recognized by the Court.
 
 
 99
 Accordingly, the Consent Decree signed by the United States of America and the City of Miami, filed in this Court February 18, 1976, as modified by a document signed by the United States of America and the City of Miami and filed in this Court on December 14, 1976, is accepted by this Court.
 
 
 100
 The Consent Decree, as so modified, will be signed this date by this Court. Upon signing by the Court, that Consent Decree will constitute the Final Judgment in the cause.
 
 
 101
 Because the Consent Decree contains the following injunctive order (permanent in nature):
 
 
 102
 1. The defendant City of Miami, its officials, agents, employees, and all persons in active concert or participation with them in the performance of City functions (hereinafter collectively referred to as the City) are permanently enjoined and restrained from engaging in any act or practice which has the purpose or effect of unlawfully discriminating against any employee of, or any applicant or potential applicant for employment with, the City of Miami because of such individual's race, color, sex or national origin ....
 
 
 103
 The Fraternal Order of Police and the Police Benevolent Association will not be dismissed as parties to the action.
 
 
 104
 (Emphasis added).
 
 
 105
 As noted above, the Florida law concerning a municipality's power to alter unilaterally matters properly the subject of collective bargaining is unsettled. The most nearly cognate address of this subject by the district court is its conclusion, expressed in its final order imposing the other parties' "consent" injunction on the nonconsenting FOP, that "the Consent Decree in its present form and under the present circumstances, does not violate the contractual relationship between (the City and the FOP)."[7] This cannot be a factfinding, since there has never been a trial on the merits. But if it were, it could not be dispositive here, in view of the state of Florida law, noted above at footnote 4. In our view, it is difficult to avoid the conclusion that the trial court, annoyed perhaps with the union's failure to comply with its listing instruction, punished it by ruling against it without a trial. We think it beyond our powers to approve this rough application of justice.
 
 
 106
 An appellant is before us complaining that it has had no day in court-has never been set for trial or had notice of a setting-but has been judged away. This error is so large and palpable that, like an elephant standing three inches from the viewer's eye, it is at first hard to recognize. The major dissent is reduced to arguing that it is all right to enter a permanent injunction without a trial against one who is unable, in advance of such a trial, to show the court how his rights will be infringed by the order. Here is new law indeed, law that we cannot accept.
 
 
 107
 And while it is well and very well to extoll the virtues of concluding Title VII litigation by consent, as do our brethren-a sentiment in which we concur-we think it quite another to approve ramming a settlement between two consenting parties down the throat of a third and protesting one, leaving it bound without trial to an agreement to which it did not subscribe. If this be permitted, gone is the protester's right to appear in court at a trial on the merits, present evidence, and contend that the decree proposed is generally infirm-as imposing unconstitutional or illegal exactions-so that it should not be entered at all or so as to bind any party or affected third party.[8] Who can know what the protester might have been able to show at such a hearing, one to which first-reader principles of procedural due process entitle it? Surely, whether or not it had the power to persuade the trial court, it had the right to try.
 
 
 108
 Gone as well is the suppressed party's right to try to demonstrate particular infirmities in the decree as applied to bind it and its union members. Any suggestion that the union's contract rights are not affected by this decree is insupportable. Promotion, for example, is one of the most important subjects of collective bargaining. See NLRB v. E. C. Atkins & Co., 331 U.S. 398, 413, 67 S.Ct. 1265, 1273, 91 L.Ed. 1563, 1573 (1947). As Judge Rubin's opinion demonstrates, it is undeniable that this decree affects promotions, merit increases, and job transfers that are embodied in an existing city ordinance, incorporated by reference in the FOP's bargaining agreement.
 
 
 109
 We think it evident that what has been done below is to infringe the collective bargaining rights of the FOP and its members without either its consent or a trial, to subject it to a potential contempt order, and to enjoin it publicly from doing various reprehensible and illegal things that no one proved it had ever done or so much as thought of doing.
 
 
 110
 It seems elementary that one made a party to a lawsuit is entitled to his day in court before permanent relief is granted against him over his protest. This the FOP has not had. No amount of argument that this union has not shown how its rights were affected can obscure the fact that the question was begged below and its answer assumed: here there was no trial on the merits at which it might have made such a showing and tried out its claim that the consent decree, with its racial and sexual quotas, violates the fourteenth amendment and hence is generally infirm.[9]
 
 
 111
 At trial, the union's contentions may fail; they may deserve to fail. That is not the question. The question is whether the union can be enjoined over its protests without a trial on the merits, without notice, without evidence, without supporting findings of fact. We would answer that it cannot be. As to it, therefore, the entry of the consent decree and the injunction enforcing it should be vacated and the case remanded.
 
 
 112
 As to the United States and the City of Miami-parties who did in fact consent to its entry-we would not absolutely vacate the entry of the decree. Nor, however, would we entirely affirm its entry or the permanent injunction incorporated in and enforcing it. Instead, in the exercise of our general equitable and supervisory powers, we would leave the decree in force pending that hearing on the merits to which the FOP is entitled and reduce the injunction enforcing it to a preliminary one. We would do so in order that the FOP might have its opportunity to make such constitutional and other contentions as it wishes regarding that decree at trial and to be certain that, should the court conclude at trial that the decree is invalid, as the FOP contends, it cannot be left in the incongruous position of declaring the decree "unlawful, unreasonable or inequitable"[10] but, bound by our affirmance, required to enforce it anyway against the City-thus indirectly, but effectively and in that event improperly, trammeling the rights of thousands of city employees unrepresented here. By so doing, we would leave the hands of the court below free to validate and reenter the decree across the board after a trial on the merits or, after that trial, to vacate the preliminary injunction and decree to whatever extent it should think fit. This we would do to preserve the status quo as we find it-the decree having been in place for several years and many actions having been taken in reliance on it during that time-pending trial on the merits and, as well, to allow the trial court entire freedom regarding the decree in the light of evidence received at trial on the merits.[11]
 
 
 113
 Should the United States and the City of Miami conclude that binding the FOP to their consent decree is not after all necessary to their purposes, they may of course seek its dismissal from the case and the reentry of the decree forthwith. What they may not do, we think, is agree among themselves about FOP's legal rights and impose their agreement upon it with neither consent nor trial. Results are important. But, as we tirelessly reiterate in the criminal field, they may not, however desirable, be obtained in federal court at the expense of due process. Since these were, they cannot stand.
 
 
 114
 Those concurring in this opinion would decree relief as suggested above. As the court's per curiam statement indicates, however, we are in full accord that at least the relief directed by Judge Rubin's opinion should be granted the FOP. We therefore concur in the result mandated by his opinion, although we would have granted broader relief, and dissent from the failure of the court to do so.
 
 TJOFLAT, Circuit Judge, dissenting:
 
 115
 I must dissent because I believe we do not have jurisdiction to resolve this case. Accordingly, I would dismiss this appeal, leaving the consent decree in effect.
 
 
 116
 It is axiomatic that this court is one of limited, statutory jurisdiction. Huckeby v. Frozen Food Express, 555 F.2d 542, 545 (5th Cir. 1977). See also 28 U.S.C. §§ 1291 & 1292 (1976). Thus, "(a)s a threshold issue, it is incumbent upon (us) to determine whether (we) may properly exercise ... jurisdiction in each case." United States v. Mendoza, 491 F.2d 534, 536 (5th Cir. 1974). See also Cason v. Owen, 578 F.2d 572, 573 (5th Cir. 1978). Upon examination, the facts of this case simply do not provide the necessary foundation for exercise of our power.
 
 
 117
 This appeal concerns a consent decree entered into by the United States and the City of Miami. In 1975, the United States filed a Title VII employment discrimination suit against the City of Miami, the Fraternal Order of Police (FOP), and various other parties. Prior to a trial on the merits, the United States and the City of Miami settled their differences. These parties memorialized their agreement in a proposed consent decree, which they submitted to the district court for approval. The district court approved this consent decree, concluding the litigation between the City of Miami and the United States. The district court retained jurisdiction over the FOP; there had as yet been no final decree disposing of the federal government's claim against the FOP. This appeal by the FOP contesting the consent decree followed.
 
 
 118
 The panel that originally decided this case stated:
 
 
 119
 the consent decree orders no relief against the FOP. Unless the FOP can demonstrate that it has been ordered to take some action by the decree, or ordered not to take some action, or that its rights or legitimate interests have otherwise been affected, it has no right to prevent the other parties and the Court from signing the decree.
 
 
 120
 (N)o rights of the FOP are affected by the decree. United States v. Miami, 614 F.2d 1322, 1329 (5th Cir. 1980). The majority, in my mind, has not refuted this determination. We are left, therefore, with the jurisdictional problem posed by the court's insistence upon hearing an appeal brought by a party whose rights are left undisturbed by the consent decree entered below. Because the record reveals that none of the traditional avenues of jurisdiction is available to us in this case, the court's action is clearly inappropriate.
 
 
 121
 Initially, it is clear that, as the decree does not affect the FOP, the district court has not entered a final judgment disposing of the claims made against the FOP; the district court's refusal to dismiss the FOP as a party to the action is an implicit acknowledgement that this is so. Thus, appeal cannot lie under 28 U.S.C. § 1291 (1976), the statute providing us with jurisdiction of appeals from final decisions of district courts, because that statute requires that, to be appealable, a judgment must dispose of all claims of all parties. Ray v. Texaco, Inc., 488 F.2d 1087 (5th Cir. 1973). See also Ryan v. Occidental Petroleum Corp., 577 F.2d 298, 300-301 (5th Cir. 1978). Similarly, because the consent decree does not affect the FOP's rights, it is not an appealable interlocutory order under 28 U.S.C. § 1292(a)(1) (1976).[1] Finally, while it is true that, under Fed.R.Civ.P. 54(b), appeals will lie from certain judgments that do not dispose of all claims of all parties, the district court in this case has not certified that this action meets the requirements of the rule.[2] Furthermore, even if the district court had certified this cause under Rule 54(b), the only parties that could have appealed thereunder are those parties affected by the injunction, the City of Miami and the United States. These parties, however, have already settled their litigation and thus have no role to play before this court. I am at a loss, therefore, to discern the basis for the exercise of jurisdiction in this case.
 
 
 122
 By acting outside the scope of its properly limited power, the court has abused its authority. Furthermore, by doing so under these circumstances, it will inevitably lead the district courts of this circuit astray in regard to the appealability of consent decrees that do not adjudicate the rights of all parties and dispose of the entire case, thus undermining the orderly process of settlement.
 
 
 123
 For these reasons, I respectfully dissent.
 
 
 124
 FRANK M. JOHNSON, Jr., Circuit Judge, concurring in part and dissenting in part, joined by GODBOLD, Chief Judge, KRAVITCH, HATCHETT, TATE, SAM D. JOHNSON and JERRE S. WILLIAMS, Circuit Judges:
 
 
 125
 Because the Court's decision, as set forth in the per curiam opinion, modifying the district court's decree to eliminate its provisions as to police promotions, and remanding the case to determine whether the government has a right to claim relief as to promotions is not in accord with the facts as reflected by the record or with controlling legal principles, I respectfully dissent. The per curiam opinion of the Court and Judge Gee's and Judge Rubin's separate concurring opinions have inadequately detailed the factual background of this litigation. When the FOP's role is viewed in the context of the complete procedural history of the case, the court's conclusion is exposed for what it is: the partial vacating of a valid consent decree entered into in good faith by the litigants and, after numerous hearings, approved by the district court-all for the purpose of attempting to eliminate the effects of past discriminatory practices that operated adversely to all women and black males and granted illegal preference to white males in the Miami Police Department. A closer examination of the complex procedural history involved and the issues raised by this appeal will demonstrate why the consent decree should be affirmed in all respects.
 
 I. Facts
 
 126
 In the Title VII complaint filed on December 29, 1975, by the United States Attorney General (the Government) against the City of Miami (City), the FOP and the Miami Police Benevolent Association (PBA) were identified as labor organizations (as defined by 42 U.S.C.A. § 2000e-(d))[1] and named as parties defendant pursuant to Rules 19 and 20 of the Federal Rules of Civil Procedure. On January 28, 1976, the FOP and PBA (the Unions) filed their answers to the complaint which denied the allegations in the complaint and raised various affirmative defenses.[2] The Unions subsequently filed answers to the amended complaint on February 6, 1976, moved to dismiss the class action on February 11, 1976,[3] and propounded interrogatories to the City and Government on February 12 and 13, 1976.
 
 
 127
 In the meantime, negotiations commenced between the City and the Government which resulted in the entry of a consent decree on February 18, 1976. Upon the Unions' motion,[4] the district court vacated the consent decree on April 2, 1976; the district court stated that the decree was "improvidently signed" because it apparently affected "certain contractual provisions of a contract between the City of Miami and the Fraternal Order of Police and the Miami Police Benevolent Association." The district court further directed that the Unions specify in a list[5] the specific provisions of their collective bargaining agreement that were in conflict with the consent decree and that the City and the Unions meet in an effort to reconcile their differences. It is significant to note that the FOP was allowed to present its objections to the decree during the March 29, 1976, hearing before the district court and that the court placed the burden on the FOP to show specifically which provisions of its collective bargaining agreement were infringed by the decree.[6] The district court then indicated that after the FOP met this burden the court would grant another hearing before a new decree was signed in order to determine whether the provisions allegedly in conflict had been reconciled.
 
 
 128
 The Unions received answers to their interrogatories from both the City and the Government by October 1, 1976, after the district court lifted a protective order at the Unions' request on August 18, 1976, that had stayed discovery.[7] The City and Government then made joint motions to re-enter the consent decree; on December 13, 1976, the district court conducted a hearing on these motions after the City filed an affidavit attesting to the failure of the City and the Unions to resolve their differences. At this hearing, all of the parties were allowed to present their arguments on the motions to re-enter the consent decree. Once again the Unions raised all of their previously asserted constitutional arguments against the propriety of the entry of the decree; moreover, the Unions specifically argued that the requested relief constituted reverse discrimination against their white members "without a trial on the issues and without evidence."
 
 
 129
 The City responded to some of the concerns raised by the district court at the December 13, 1976, hearing by submitting a number of modifications to the decree. Because the district court still had some concerns about the propriety of re-entering the decree, it held yet another hearing for all of the parties on February 8, 1977. The consent decree, as modified, was re-entered on March 31, 1977, over the Unions' objection.
 
 
 130
 In its March 31, 1977, order the district court specifically found that "the consent decree in its present form and under the present circumstances does not violate the contractual relationship between the City of Miami and the FOP and the PBA." The district court also held that "(t)he consent reached is constitutionally valid" and "should be recognized by the court." The Unions were not dismissed by the district court because the decree contained the following injunction:
 
 
 131
 1. The defendant City of Miami, its officials, agents, employees, and all persons in active concert or participation with them in the performance of City functions (hereinafter collectively referred to as the City) are permanently enjoined and restrained from engaging in any act or practice which has the purpose or effect of unlawfully discriminating against any employee of, or any applicant or potential applicant for employment with, the City of Miami because of such individual's race, color, sex or national origin ...
 
 
 132
 The Fraternal Order of Police and the Police Benevolent Association will not be dismissed as parties to the action.
 
 
 133
 Thus the Unions, as parties seemingly bound by the district court's consent decree, brought the instant appeal.
 
 
 134
 II. The district court did not err in finding that the consent decree did not abridge the Unions' collective bargaining rights.
 
 
 135
 The Unions contend on appeal that, because the consent decree affected terms and conditions of employment, it abridged the collective bargaining rights of their members. During the March 29, 1976, hearing, the district court was concerned that the City's compliance with the decree could require the City to break its collective bargaining agreement with the Unions; this concern resulted in the vacation of the decree in April, 1976. Moreover, the Unions argue that, because the decree contemplates the suspension of the Civil Service testing procedures upon which promotions are based, the decree deprives union members of their vested rights to promotions under the existing Civil Service ordinance. In sum they assert that the right of public employees to collectively bargain is protected by the Florida Constitution, Article I, § 6, and that the United States Constitution, Article I, § 10, protects against interference with their right to contract.
 
 
 136
 The district court's factual finding that the decree did not abrogate the Unions' rights under the collective bargaining agreement is, upon review, subject to the clearly erroneous standard. It is interesting to note that the Unions have strenuously and consistently argued that their rights were abridged by the decree, yet at no point in their five briefs filed with this Court do they detail exactly which rights were illegally infringed by the consent decree. Unfortunately, Judge Gee's and, to a lesser extent, Judge Rubin's insistence that the FOP was unable to make such a showing because it was not granted a trial on the merits overlooks the fact that the district court placed the burden of showing a conflict on the FOP and granted the FOP two hearings in which it failed to do so.[8] Consequently, the Unions have failed to show that the district court's factual finding that no conflict existed between the decree and the collective bargaining agreement was clearly erroneous.[9]
 
 
 137
 Even if this Court were to review the district court's factual finding independently, that court's conclusion of no impairment of union rights is supported by the record. Article VI of the collective bargaining agreement states in part:
 
 Rights of Management
 
 138
 The right to hire, lay off, promote, demote, transfer, discipline, require observance of the City's rules and regulations, and maintain efficiency of employees is expressly reserved unto the City, provided that no employee shall be discriminated against as such, and that the City shall enforce and comply with the provisions of the Agreement so as not to violate the City Charter or the Civil Service Rules and Regulations (Ordinance 6945 as amended). (Emphasis added.)
 
 
 139
 During oral argument the Unions' counsel conceded that the Unions lacked standing to challenge any of the decree's hiring provisions since they did not represent potential applicants for employment. Moreover, the Unions certainly have no standing to challenge any of the decree's provisions that affect fire and sanitation workers as they do not purport to represent any workers other than police personnel; the fire and sanitation workers have not appealed the validity of the consent decree as to their departments.[10] The Unions also admitted that the conditions of employment (other than hiring) allegedly affected by the decree, such as promotions, merit increases, and job transfers, do not appear on the face of the collective bargaining agreement itself but are codified in the City's Civil Service Ordinance # 6945. These conditions were incorporated in the collective bargaining agreement by reference.
 
 
 140
 The Unions' position is that the City, through its Civil Service Board, cannot unilaterally amend the civil service ordinance in order to conform to the consent decree. However, they offer no authority to support that position. There are no Florida cases on point which address the precise issue raised by the FOP: whether a city, as a public employer, may unilaterally amend its civil service ordinance to comply with a consent decree entered in a federal court that was designed to rectify an admitted past pattern and practice of racial and sexual discrimination. In this case, the City clearly reserved in the collective bargaining agreement the right to hire, promote and discipline unto itself as a right of management. Apparently under Florida law, the City, as a public employer, has certain management prerogatives reserved to it under Fla.Stat.Ann. § 447.209 (1974) and the City is free to exercise those prerogatives by making unilateral changes in its rules and regulations which may affect its collective bargaining agreement with public employees. Cf. Pinellas County Police Benevolent Ass'n v. Hillsborough County Aviation Auth., 347 So.2d 801, 803 (Fla.Dist.Ct.App.1979) (under Fla.Stat.Ann. § 447.309(3), Civil Service Board has discretion to adopt amendments to its rules and regulations that do not conform to an existing collective bargaining agreement); Tanner v. McCall, 441 F.Supp. 503, 508 (M.D.Fla.1977) (interpreting Fla.Stat.Ann. § 447.209), modified on other grounds, 625 F.2d 1183 (5th Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 1975, 68 L.Ed.2d 295 (1981). But the City's management rights are not absolute as the exercise of those rights must not preclude employees or their representatives from raising grievances or violate the City's duty to bargain collectively under Fla.Stat.Ann. § 447.309(1) (1977). See, e. g., School Bd. of Indian River Cty v. Indian River Cty Ed. Ass'n, 373 So.2d 412 (Fla.Dist.Ct.App.1979); School Bd. of Orange Cty v. Palowitch, 367 So.2d 730 (Fla.Dist.Ct.App.1979); Fla.Stat.Ann. § 447.209.[11] The City has not prevented members of the FOP from filing grievances challenging the amended civil service ordinance as there are at least five such cases pending (that have been stayed pending the outcome of the instant appeal).
 
 
 141
 Moreover it is interesting to note that Section 447.309(5) provides that a collective bargaining agreement shall contain all of the terms and conditions of employment except those provided for in any appropriate ordinance relating to merit and civil service rules and regulations. It would appear that the Florida legislature intended civil service rules and regulations to be non-negotiable items. I agree with the majority that promotion is an important subject of collective bargaining under federal law. However, the right to promote under the collective bargaining agreement involved was a management right expressed through the City's civil service rules and regulations. The Florida Supreme Court has yet to address the issue of the proper interpretation of a public employer's management rights under Section 447.209 vis-a-vis that employer's duties under Section 447.309. Moreover, such a change made by the City in an effort to comply with a judicially approved consent decree would also appear to be consistent with the prohibition against racial or sexual discrimination in employment by any state department under Fla.Stat.Ann. § 112.042 (1971) and with the City's duty to develop and implement affirmative action programs under Fla.Stat.Ann. § 110.112(2) (1979). It is clear that if a provision in a collective bargaining agreement is in conflict with a Florida statute that provision is invalid. See Boatright v. City of Jacksonville, 334 So.2d 339 (Fla.Dist.Ct.App.1976); Fla.Stat.Ann. § 447.309(5). My point here is simply that the City's change of a civil service ordinance that was incorporated into a collective bargaining agreement via a savings clause (Article XXX) is not per se illegal, a result suggested by the Palowitch and Indian River cases cited in Judge Gee's and Judge Rubin's concurrences. See, e. g., City of Jacksonville v. Acker, 385 So.2d 706 (Fla.Dist.Ct.App.1980).[12]
 
 
 142
 The FOP argued during its motion in opposition to the re-entry of the decree that a home rule municipality (such as the City) cannot change an ordinance that affected the rights of municipal employees without a referendum of its electors under Fla.Stat.Ann. § 166.021(4)(1981)[13]; during one of the hearings, the district court concluded that Section 166.021 does not affect the City's ordinance-making power. Because the issue of whether a city acting through its civil service board may properly amend its civil service regulations unilaterally under either Section 447.209 or Section 447.309(5) is still an open question under Florida law, in my opinion the FOP has failed to make a prima facie showing that the City violated any of its rights by amending its civil service ordinance. See Newman v. Stein, 464 F.2d 689, 693 (2d Cir.), cert. denied, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1972) (uncertainty in the law is a factor which normally commends compromise to district court's discretion).
 
 
 143
 It is significant to note that the City stipulated in the statement of uncontested facts[14] that the City was utilizing invalidated examinations in all hiring and promotion classifications (with a few exceptions not relevant here). The Unions argue that the City's temporary suspension of the testing procedure and the use of departmental seniority and qualifications in lieu of testing infringed upon their members' vested promotional rights. Once again the Unions have failed to offer any authority for the proposition that their members' subjective expectations regarding the old testing and promotional system were vested under either state or federal law. In Florida, a civil servant has no clear legal right to be promoted. See Tanner v. McCall, supra, 441 F.Supp. at 508; McLaughlin v. Dade County Port Authority, 210 So.2d 242, 243 (Fla.Dist.Ct.App.1968); 9 Fla.Jur.2d Civil Servants and Other Public Officers and Employees, § 192 (1979).
 
 
 144
 Moreover, it is beyond a doubt that tests which have an adverse racial impact and cannot be validated as job related under existing Title VII guidelines are impermissible under federal law. See Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975); Ensley Branch of NAACP v. Seibels, 616 F.2d 812 (5th Cir. 1980), cert. denied, Personnel Bd. of Jefferson County, Ala. v. U. S., 449 U.S. 1061, 101 S.Ct. 783, 66 L.Ed.2d 603 (1981). Thus the City's decision to suspend its civil service examinations until validation was reasonable given (a) its stipulation that non-validated tests for police hiring and promotions were in effect, (b) its agreement in an earlier litigation to utilize validated tests,[15] and (c) the stipulated gross statistical disparity between white male officers and minority and female officers.
 
 
 145
 The Unions also contend that the seniority rights of their members have been abridged by the decree. However, the civil service ordinance did not provide for a seniority system that has been changed in any way to allow the city to comply with the decree. The City's temporary use of a woman's or minority's qualifications and seniority in the police department as a basis for a promotional preference only when these minorities are as qualified as their white male counterparts does not contravene any extant seniority system and is a reasonable response to the effects of past discrimination. See United States v. City of Alexandria, 614 F.2d 1358, 1366 (5th Cir. 1980). Thus in my judgment the rationale of International Brotherhood of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) is totally irrelevant to this case. In sum, the consent decree's provisions with respect to hiring, promotions, and seniority do not illegally conflict with the collective bargaining rights of Union members under either state or federal law.
 
 
 146
 III. The district court did not err in approving the decree despite the Unions' objections.
 
 
 147
 In this Circuit the standard of review for challenges to a consent decree involving third parties is whether the decree is unlawful, unreasonable or inequitable. See United States v. City of Alexandria, supra, 614 F.2d at 1361 & n.6; United States v. City of Jackson, 519 F.2d 1147, 1151 (5th Cir. 1975). Moreover, this Court is bound to defer to the district court's decision to enter the decree unless the district court abused its discretion in approving the decree. See United States v. Allegheny-Ludlum Indus., Inc., 517 F.2d 826, 850 (5th Cir. 1975), cert. denied sub nom. Harris v. Allegheny-Ludlum Indus., 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976). It is inconceivable to me how the majority can justify its decision to vacate a most substantial portion of the consent decree without fully discussing the context in which the decree was approved. Not only does the majority's decision ignore the mandated standard of review but it also flies in the face of the procedural history and the facts of this litigation.
 
 
 148
 The district court specifically held that it found the relief proposed in the decree constitutional. The Unions' main contention on appeal is that the preferences granted to minority and women police officers by the decree constitute "reverse discrimination" against white male police officers in violation of their constitutional rights. Basically the Unions are arguing that the district court abused its discretion by approving the decree without making a specific judicial finding of past discrimination that would justify the infringement of their members' Title VII rights.
 
 
 149
 The panel opinion made an excellent analysis in explaining why the consent decree's use of hiring and promotional goals was not per se unconstitutional. See 614 F.2d at 1335-1338. I do not believe that any of the parties involved seriously denies that past discrimination based on race has occurred and that the effects and results of that discrimination continue today. In fact, counsel for the City stated during the December 13, 1976, hearing that "(t) here has been discrimination based upon race and (the) employment practices of the City of Miami" and the City "has a desire to correct the present effect of that past discrimination which it admits."
 
 
 150
 The Supreme Court's most recent analysis of the use of hiring goals or quotas by an employer is found in United Steelworkers of America v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). The Supreme Court approved the employer's voluntary implementation of an affirmative action plan against the challenge of a white employee who claimed to be injured by the plan. Id. at 208, 99 S.Ct. at 2730. That plan utilized quotas which allowed the employer less flexibility than the ones involved in this consent decree. Accordingly, the decree would appear to meet the Supreme Court's standard that the proposed relief be closely tailored to remedy the effects of past discrimination and not unnecessarily trammel the rights of white workers. Id. The fact that a private employer was involved in Weber does not significantly affect the applicability of the Weber rationale to this case.[16]
 
 
 151
 Furthermore, there was more than ample evidence for the district court to conclude that the proposed relief was a reasonable means to correct past discrimination. The gross statistical disparities between the number of women and minorities on the Miami police force and the number of women and minorities in the Miami work force were sufficient to establish a prima facie case of discrimination. See Phillips v. Joint Legislative Comm., etc., 637 F.2d 1014, 1026 (5th Cir. 1981); United States v. City of Alexandria, supra, 614 F.2d at 1364. It is still an open question whether a judicial determination of past discrimination is required before a district court may approve a voluntary consent decree. See, e. g., Detroit Police Officers Ass'n v. Young, 608 F.2d 671, 694 (6th Cir. 1979), petition for cert. denied, --- U.S. ----, 101 S.Ct. 3079, 69 L.Ed.2d 951 (1980).
 
 
 152
 The resolution of the issue of what a public employer may do rather than what it must do under Title VII should allow the district court more flexibility in fashioning an appropriate remedy in the context of voluntary compliance. Id., 608 F.2d at 689. When the statistical disparity admitted in the uncontested statement of facts is considered along with the prior judicial findings of discrimination in the Miami police department and the various admissions of discrimination made by the City before the district court, the district court did not abuse its discretion in approving the consent decree. See United States v. Alexandria, supra; United States v. Allegheny-Ludlum, supra; see also EEOC v. American Tel. & Tel. Co., 556 F.2d 167, 174 (3d Cir. 1977), cert. denied, 438 U.S. 915, 98 S.Ct. 3145, 57 L.Ed.2d 1161 (1978); Cohen v. City of Miami, supra.
 
 
 153
 It must be remembered that the purpose of a consent decree is to avoid a trial and allow parties to settle their dispute without the expense of a protracted litigation. See Cotton v. Hinton, 559 F.2d 1326, 1330 (5th Cir. 1977). Accordingly the decree should be construed as written, not as it might have been written if the plaintiff had had an opportunity to establish all possible factual and legal claims. See United States v. Armour & Co., 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1970).
 
 
 154
 The policy underlying Title VII favors voluntary compliance with the Act. See 614 F.2d at 1331; United States v. Allegheny-Ludlum, supra, 517 F.2d at 846. It is undisputed that the City and Government have consented to the relief contemplated by the decree and that none of the other departments affected by the decree have appealed from it. The only real issue raised by this appeal is the significance of the Unions' lack of consent to the entry of the decree. In other words the precise issue for this en banc Court is whether the district court erred by approving the decree over the Unions' objections.
 
 
 155
 It is beyond a doubt that the Unions objected to the consent decree in its original and modified form. However, it is equally clear that the district court took those objections into consideration before the decree was ultimately entered: the district court temporarily vacated the decree at the Unions' request, allowed discovery to continue, and granted several hearings at which the Unions were free to convince the district court as to the validity of their position. The Unions were not prevented from participating in any of the proceedings before the district court. In short, the Unions were treated as parties throughout the proceedings by the district court. It is for this reason that I cannot abide with the conclusion that the FOP and PBA did not have their "day in court": not only did they have their day, they had over one year to convince the district court that the decree infringed upon the rights of their members under the collective bargaining agreement. The Unions were granted three hearings before the district court in which they were given the opportunity to demonstrate the alleged violation of their contractual and constitutional rights. It is clear to me that the Unions' consent was not required because the decree did not infringe upon any rights of the union members and did not order any affirmative relief against the Unions; consequently, the Unions were not entitled to a full-blown trial on the merits since they failed to meet their burden of alleging facts that would justify such a trial. However, I am convinced that the district court committed error not by approving the decree but by retaining the Unions as parties once the district court had ascertained that none of the Unions' collective bargaining rights were infringed by the decree. Consequently, the Unions' consent to the decree was not required since their rights were not prejudiced by the entry of the decree. See In re Beef Industry Antitrust Litigation, 607 F.2d 167 (5th Cir. 1979), petition for cert. denied, --- U.S. ----, 101 S.Ct. 3029, 69 L.Ed.2d 405 (1980); cf. Society Hill Civic Ass'n v. Harris, 632 F.2d 1045, 1059 (3d Cir. 1980) ("consent decree can only be attacked on the ground that its substantive provisions unlawfully infringe the rights of the complainant").
 
 
 156
 The Government originally joined the Unions because it appeared that they had an interest in the litigation by virtue of their collective bargaining agreement which could and did affect the initial entry of the decree. However, once the court determined that the Unions' rights were not adversely affected by the decree, they should have been dismissed from the litigation since they were no longer a necessary party within the meaning of Rule 19(a) of the Federal Rules of Civil Procedure. Cf. Le Beau v. Libby-Owens-Ford Co., 484 F.2d 798 (7th Cir. 1973) (international union not indispensable party given its mere speculative interest in litigation); 7 Wright & Miller Federal Practice and Procedure § 1620. A party that has been improperly joined within the meaning of Rule 21 may be dropped upon motion of the parties or by the district court sua sponte at any stage of the action, so long as such motion will not prejudice the remaining parties. See Gentry v. Smith, 487 F.2d 571 (5th Cir. 1973); 7 Wright & Miller Federal Practice and Procedure § 1684; cf. Atwood v. Pacific Maritime Ass'n, 432 F.Supp. 491 (D.Ore.1977) (employer would be prejudiced if union dropped as party).
 
 
 157
 None of the parties moved to dismiss the Unions at any point in the litigation; moreover, the district court did not exercise its discretion to dismiss them because of its perception that the injunctive relief ordered by the decree could be frustrated if the Unions were not retained as parties. I do suggest that the district court's misconception that the injunctive relief required the Unions' presence[17] constituted an abuse of discretion especially since the decree ordered no affirmative or permanent relief against them. See Anderson v. Moorer, 372 F.2d 747 (5th Cir. 1967). My answer to the conclusion that the Unions did not have their day in court is that from the time the district court determined their rights were not affected they should not have been in court as their legal rights were not further involved in the litigation.
 
 
 158
 I thus agree with Judge Tjoflat's conclusion that the appeal should be dismissed, but for different reasons.[18] I disagree with Judge Tjoflat's conclusion that the dismissal of the Unions' appeal has a substantially similar effect as the majority's vacation and subsequent remand to the district court; if the appeal were dismissed, the decree would remain in effect until a proper party successfully challenged it. Because the consent decree meets the standard of being constitutional, lawful and reasonable, I would affirm it in light of our judicial policy favoring voluntary resolutions of disputes. Moreover, we should not consider this decree in a vacuum. It is a responsible attempt by the City of Miami to resolve some of its racial problems.
 
 
 159
 I dissent.
 
 
 
 *
 Former Fifth Circuit case, Section 9(1) of Public Law 96-452-October 14, 1980
 
 
 **
 Judge James P. Coleman and Judge Will L. Garwood did not participate in this decision
 
 
 [1]
 Two congressional committees have since declared that these amendments did not strip the Attorney General of his authority to file pattern or practice suits against state and local governments. See S.Rep.No.750, 95th Cong., 2d Sess. 4 (1978); H.R.Rep.No.1069, 95th Cong., 2d Sess. 8 (1978). But efforts by individual members of Congress or congressional committees to state retrospectively the earlier intention of the Congress as a legislative body do not suffice to interpret the meaning of a statute formally enacted by an earlier Congress. Compare Rogers v. Frito-Lay, Inc., 611 F.2d 1074, 1080 (5th Cir.) ("The retroactive wisdom provided by the subsequent speech of a member of Congress stating that yesterday we meant something that we did not say is an ephemeral guide to history."), cert. denied, 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980) and id. at 1082 ("(A) committee is not the Congress. It cannot create a congressional intent that did not exist, or amend a statute by a report.") with Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 380-81, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371, 383 (1969) ("Subsequent legislation declaring the intent of an earlier statute is entitled to great weight in statutory construction.") (emphasis supplied) and FHA v. Darlington, Inc., 358 U.S. 84, 90, 79 S.Ct. 141, 145, 3 L.Ed.2d 132, 137 (1958) ("Subsequent legislation which declares the intent of an earlier law is not ... conclusive in determining what the previous Congress meant. But the later law is entitled to weight when it comes to the problem of construction.") (emphasis supplied). But see Cannon v. University of Chicago, 441 U.S. 677, 687 n.7, 99 S.Ct. 1946, 1952 n.7, 60 L.Ed.2d 560, 569 n.7 (1979) ("Although we cannot accord (later remarks by individual legislators) the weight of contemporary legislative history, we would be remiss if we ignored these authoritative expressions concerning the scope and purpose of (a civil rights statute) and its place within 'the civil rights enforcement scheme' that successive Congresses have created over the past 110 years."). See generally R. Dickerson, The Interpretation and Application of Statutes 179-83 (1975)
 
 
 [2]
 The date set by 42 U.S.C. § 2000e-6(c)
 
 
 [3]
 Section 122 of the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. § 1242, and § 2 of the Crime Control Act of 1973, 42 U.S.C. § 3766(c), also appear to authorize the Attorney General to bring this type of action. See City of Milwaukee v. Saxbe, 546 F.2d 693, 705-06 & n.10 (7th Cir. 1976)
 
 
 [4]
 The United States alleged that the PBA was the predecessor of the FOP. The FOP denied this in an affidavit that stands uncontroverted. In Adams v. Miami Police Benevolent Ass'n, 454 F.2d 1315 (5th Cir.), cert. denied, 409 U.S. 843, 93 S.Ct. 42, 34 L.Ed.2d 82 (1972), we found that the PBA was a nonprofit corporation, then admitting only white police officers. We held that it was then so closely entwined with the police department that it was acting under color of state law when it barred black police officers from membership, and we affirmed a district court order requiring it to admit them
 
 
 [5]
 The FOP objects to the sufficiency of these answers because the City did not answer some questions but merely offered the FOP the opportunity to inspect the City's records and gather the data for itself. Considering the questions answered and the latitude afforded the FOP, we deem those answers to have been sufficient
 
 
 [6]
 As amended by § 122 of the State and Local Assistance Act of 1972. See note 3 supra
 
 
 [7]
 Kaspar Wire Works, Inc. v. Leco Eng'r & Mach., Inc., 575 F.2d 530, 538-39 (5th Cir. 1978); see 1B Moore's Federal Practice P 0.409(5), at 1026 & n.2 (2d ed. 1980 & Cum.Supp. 1980-81) (citing cases); James, Consent Judgments as Collateral Estoppel, 108 U.Pa.L.Rev. 173 (1959)
 
 
 [8]
 See United States v. City of Jackson, 519 F.2d 1147, 1152 n.9 (5th Cir. 1975) ("appropriate sanctions" for noncompliance); United States ex rel. Shell Oil Co. v. Barco Corp., 430 F.2d 998, 1000 (8th Cir. 1970); Hopp Press, Inc. v. Joseph Freeman & Co., 323 F.2d 636 (2d Cir. 1963); Comment, The Consent Judgment as an Instrument of Compromise and Settlement, 72 Harv.L.Rev. 314 (1959)
 
 
 [9]
 We followed ITT Continental Bakery in Roberts v. St. Regis Paper Co., 653 F.2d 166, 171 (5th Cir. 1981), and Eaton v. Courtaulds of N. Am., Inc., 578 F.2d 87, 90 (5th Cir. 1978)
 
 
 [10]
 United States v. Allegheny-Ludlum Indus., 517 F.2d 826, 850 (5th Cir. 1975), cert. denied, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976); Grunin v. International House of Pancakes, 513 F.2d 114, 123-24 (8th Cir.), cert. denied, 423 U.S. 864, 96 S.Ct. 124, 46 L.Ed.2d 93 (1975)
 
 
 [11]
 Young v. Katz, 447 F.2d 431, 432-34 (5th Cir. 1971); Norman v. McKee, 431 F.2d 769, 774 (9th Cir. 1970), cert. denied, 401 U.S. 912, 91 S.Ct. 879, 27 L.Ed.2d 811 (1971); Heddendorf v. Goldfine, 167 F.Supp. 915, 925-26 (D.Mass.1958)
 
 
 [12]
 Protective Comm. for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 424-25, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1, 9-10 (1968); Florida Trailer & Equip. Co. v. Deal, 284 F.2d 567, 571 (5th Cir. 1960)
 
 
 [13]
 Cotton v. Hinton, 559 F.2d 1326, 1330 (5th Cir. 1977); see, e. g., West Virginia v. Chas. Pfizer & Co., 440 F.2d 1079, 1085-86 (2d Cir.), cert. denied, 404 U.S. 871, 92 S.Ct. 81, 30 L.Ed.2d 115 (1971). The Seventh Circuit has stated the trial court's duty succinctly:
 The trial court in approving a settlement need not inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or controversy, but need only determine that the settlement is fair, adequate, reasonable and appropriate under the particular facts and that there has been valid consent by the concerned parties. Objectors must be given reasonable notice and their objections heard and considered.
 Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights, 616 F.2d 1006, 1014 (7th Cir. 1980) (citations omitted).
 
 
 [14]
 We reviewed the standards for consent decrees in United States v. City of Alexandria, in which we said:
 the degree of appellate scrutiny must depend on a variety of factors, such as the familiarity of the trial court with the lawsuit, the stage of the proceeding at which the settlement is approved, and the types of issues involved.
 614 F.2d at 1361; cf. Antitrust Procedures and Penalties Act, § 2, 15 U.S.C. § 16(b)-(f) (prescribing publicity, comment, and determination of public interest procedures for proposed consent decrees in civil antitrust suits brought by or on behalf of United States).
 
 
 [15]
 Accord, Cotton v. Hinton, 559 F.2d at 1331; Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights, 616 F.2d at 1015; Dawson v. Pastrick, 600 F.2d 70, 75 (7th Cir. 1979); Allegheny-Ludlum Indus., 517 F.2d at 850; City of Detroit v. Grinnell Corp., 495 F.2d 448, 455 (2d Cir. 1974)
 
 
 [16]
 Although the ordinance has never been introduced as evidence, we can take judicial notice of it. Newcomb v. Brennan, 558 F.2d 825, 829 (7th Cir.), cert. denied, 434 U.S. 968, 98 S.Ct. 513, 54 L.Ed.2d 455 (1977); Bryant v. Liberty Mut. Ins. Co., 407 F.2d 576, 579-80 & n.2 (4th Cir. 1969); United States v. A.L.A. Schechter Poultry Corp., 76 F.2d 617, 623 (2d Cir.), rev'd on other grounds, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); see J. Wigmore, Evidence § 2572, at 553-54 (3d ed. 1940). Contra, Dewell v. Lawson, 489 F.2d 877, 879 (10th Cir. 1974); Howard v. United States, 306 F.2d 392, 394 (10th Cir. 1962); see Gardher v. Capital Transit Co., 152 F.2d 288, 290 (D.C.Cir.1945), cert. denied, 327 U.S. 795, 66 S.Ct. 824, 90 L.Ed. 1021 (1946); Tipp v. District of Columbia, 102 F.2d 264, 265 & n.2 (D.C.Cir.1939). See generally McCormick's Handbook of the Law of Evidence § 335, at 777 (2d ed. E. Cleary 1972)
 
 
 [17]
 The FOP also contends that the decree should not exact requirements more exigent than those incorporated into the Cohen decree. Under Cohen, the City is not required to have an independent agency administer or score validated promotional examinations after five years from the time the examinations are first given
 
 
 [18]
 See United States v. City of Alexandria, 614 F.2d at 1361 n.5; Myers v. Gilman Paper Corp., 544 F.2d 837, 847 (5th Cir.), rev'd and vacated in part, aff'd in part, and remanded per curiam, 556 F.2d 758 (5th Cir.), cert. dismissed, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977)
 
 
 [19]
 Accord, Machella v. Cardenas, 653 F.2d 923, 927 (5th Cir. 1981); Burleson v. Coastal Recreation, Inc., 572 F.2d 509, 511 (5th Cir. 1978); see Lipscomb v. Wise, 643 F.2d 319, 320-21 (5th Cir. 1981) (per curiam)
 
 
 [20]
 The FOP's collective bargaining agreement with the City gave the union no voice in the hiring of police or other municipal officers
 
 
 [21]
 See note 16 and accompanying text supra. These references in the briefs and the record are sufficient to call our attention to the ordinance. See In re Bacon, 193 F. 34, 36-37 (5th Cir.) (quoting Bluthenthal v. Jones, 208 U.S. 64, 64-65, 28 S.Ct. 192, 192-93, 52 L.Ed. 390, 390-391 (1908)), cert. denied, 225 U.S. 701, 32 S.Ct. 836, 56 L.Ed. 1264 (1912); O'Neill v. United States, 411 F.2d 139, 144 (3d Cir. 1969); Ginsberg v. Thomas, 170 F.2d 1, 3 (10th Cir. 1948); Prudential Ins. Co. of Am. v. Carlson, 126 F.2d 607, 611 (10th Cir. 1942)
 
 
 [22]
 Which P 5(b) incorporates by reference
 
 
 [23]
 Accord, United States v. City of Chicago, 549 F.2d 415, 437-38 (7th Cir.), cert. denied, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977); Kirkland v. New York State Dep't of Correctional Servs., 520 F.2d 420, 427-30 (2d Cir. 1975), cert. denied, 429 U.S. 823, 97 S.Ct. 73, 50 L.Ed.2d 84 (1976). But see Porcelli v. Titus, 108 N.J.Super. 301, 261 A.2d 364, 367-70 (App.Div.1969) (upholding school board's unilateral change in collectively bargained promotional procedure on grounds of general public necessity and "public demand for change" following civil disorders), cert. denied, 55 N.J. 310, 261 A.2d 355 (1970)
 
 
 [24]
 Accord, Porcelli v. Titus, 108 N.J.Super. 301, 261 A.2d 364, 368, 370 (App.Div.1969) (by implication), cert. denied, 55 N.J. 310, 261 A.2d 355 (1970); cf. Southwestern Petroleum Corp. v. Udall, 361 F.2d 650, 654 (10th Cir. 1966) (rights vested under "existing legislation may (not) be superseded or modified by later legislation"); International Ass'n of Fire Fighters Union Local 1974 v. City of Pleasanton, 56 Cal.App.3d 959, 129 Cal.Rptr. 68, 77-78 (1976) (under "meet and confer" statute city council's ability to legislate employment ordinance may be restricted even when proposed ordinance changes only "an existing and acknowledged practice" rather than a collective bargaining agreement or preexisting rule) (emphasis in original); Rutgers Council of the Am. Ass'n of Univ. Professors v. New Jersey Bd. of Higher Educ., 126 N.J.Super. 53, 312 A.2d 677, 683-85 (App.Div.1973) (attempted restriction of agency's duty to report to legislature)
 
 
 [1]
 There is no question here of a summary judgment or of one somehow granted on the pleadings. No such motions were filed, heard, or so much as set for hearing; nor did the court give the parties the notice required by Rule 12, Fed.R.Civ.P., that it proposed to treat any anomalous request for relief as one for summary judgment
 
 
 [2]
 In addition to Title VII, violations of the fourteenth amendment and 42 U.S.C. §§ 1981 and 1983 were asserted
 
 
 [3]
 For a recent treatment highly critical of such procedures as semi-collusive, see Walter Berns, Let Me Call You Quota, Sweetheart, Commentary (May 1981)
 
 
 [4]
 Florida law on the power of public bodies unilaterally to foreclose subjects of collective bargaining is arguably unclear, in the absence of a defintive pronouncement by the Florida Supreme Court. At least two recent decisions by intermediate appellate courts hold, however, that such unilateral changes in terms or conditions of employment, subjects of collective bargaining, are improper even though the terms changed are not covered by existing agreements. School Board v. Indian River County Education Association Local 3617, 373 So.2d 412 (Fla.App.-4th Dist. 1979); School Board v. Palowitch, 367 So.2d 730 (Fla.App.-4th Dist. 1979)
 
 
 [5]
 A body that has rejected none of our many requests for assistance as to Florida law, despite having received over 30 in the last 20 years. There being few appropriate occasions to express our gratitude for its willingness to assist us, we take this one to do so
 
 
 [6]
 Notice of the hearing provided that it was to be one on the settling parties' "Joint Motion, for Re-Entry of the Consent Decree."
 
 
 [7]
 This holding, if such it be, is, at the highest, one on a mixed question of law and fact. Indeed, in view of the absence of a trial on the merits, it could scarcely, if at all, partake of fact resolution. To characterize it as one of pure fact, to be tested by the "clearly erroneous standard" of Rule 52, Fed.R.Civ.P., would be mistaken, and clearly so. Eaton v. Courtaulds of North America, Inc., 578 F.2d 87 (5th Cir. 1978). It is difficult to envision an issue more purely legal than that of whether one written agreement, the consent decree, conflicts with another written compact, the existing collective bargaining agreement
 
 
 [8]
 Even consent decrees must not be entered if "unlawful, unreasonable or inequitable." United States v. City of Alexandria, 614 F.2d 1358, 1361 n.6 (5th Cir. 1980)
 
 
 [9]
 United Steelworkers of America v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), concerns only Title VII and does not settle that matter. Nor does Fullilove v. Klutznick, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), which treats a factual situation utterly dissimilar to this and rests, in part, on the power of Congress to place conditions on its expenditures of public funds
 
 
 [10]
 And therefore improper for entry. United States v. City of Alexandria, 614 F.2d at 1361 n.6
 
 
 [11]
 We need scarcely add that the City could not be forced by the FOP at trial to argue against the entry of a decree to which it has consented
 
 
 [1]
 Myers v. Gilman Paper Corp., 544 F.2d 837 (5th Cir.), cert. dismissed sub nom., International Brotherhood of Electrical Workers Local 741 v. Myers, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977), cited by Judge Johnson in his dissent, infra, at 463 n.18, as authority for our exercise of jurisdiction in this case, dealt with a consent decree that expressly " 'supersede(d) and replace(d)' provisions in (the union's) collectively bargained ... agreements". Myers, 544 F.2d at 846. See also id. at 843 & 845. The case is thus distinguishable, and does not support jurisdiction absent a consent decree's infringement on the rights of an appealing party
 
 
 [2]
 Rule 54(b) of the Federal Rules of Civil Procedure provides that in actions involving multiple claims for relief or multiple parties an order that finally disposes of one or more but fewer than all the claims for relief asserted, or completely determines the rights and liabilities of one or more but fewer than all the parties, does not terminate the action in the district court and is subject to revision at any time prior to entry of a final decision unless the district court has (1) expressly determined that there is no just reason for delay, and (2) expressly directed entry of a judgment
 Huckeby, 555 F.2d at 545 (footnote omitted).
 
 
 [1]
 42 U.S.C.A. § 2000e-(d) provides:
 The term "labor organization" means a labor organization engaged in an industry affecting commerce, and any agent of such an organization, and includes any organization of any kind, any agency, or employee representation committee, group, association, or plan so engaged in which employees participate and which exists for the purpose, in whole or part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment, and any conference, general committee, joint or system board, or joint council so engaged which is subordinate to a national or international labor organization.
 It is unclear why the PBA is involved in this case at all since it is not a certified collective bargaining agent of its members. The Government initially joined the PBA as the predecessor of the FOP; however, the FOP denied in an affidavit that it was the successor in interest to the PBA and that denial has not been controverted.
 
 
 [2]
 Specifically, the Unions alleged inter alia that, since the relief requested in the complaint contemplated the use of quotas, such quotas would constitute "reverse discrimination" in violation of the constitutional rights of their members
 
 
 [3]
 This cause was never certified as a class action and this motion to dismiss was not ruled on by the district court. However, the Unions made another motion to dismiss for lack of jurisdiction which was denied on June 30, 1976
 
 
 [4]
 The FOP moved to vacate the decree mainly on the grounds that the decree violated its members' contractual and constitutional rights because the decree (a) utilized a new seniority list in which race was a factor, (b) involved a quota basis for hiring and (c) stifled the City's civil service program
 
 
 [5]
 The list of specific conflicts between the consent decree and the collective bargaining agreement does not appear in the record
 
 
 [6]
 In response to a question from the district court during the March 29th hearing, the FOP conceded that the decree "probably doesn't affect too broadly the existing contract (with the City), but it is going to affect our negotiations with regard to the new contract that is coming up." The collective bargaining agreement expired on September 30, 1976, but the collective bargaining agreement subsequently negotiated was virtually the same for the purposes of our review
 
 
 [7]
 On March 5, 1976, the City moved for a protective order to prevent discovery since the consent decree had been entered prior to the Unions' request for interrogatories
 
 
 [8]
 Even Judge Tjoflat emphasizes in his dissent that no rights of the FOP were affected by the decree. The significance of the absence of a conflict between the decree and the Union's contract to this appeal will be discussed in Section III
 
 
 [9]
 At oral argument the Unions' counsel contended that they did not have the burden of showing that the district court's factual finding was clearly erroneous as long as they could show any impairment of their contractual rights. Since the Unions have not made any showing of impairment, they have completely failed to show that the factual finding was erroneous
 
 
 [10]
 Two groups representing employees, the Miami Community Police Benevolent Association (black police officers) and the Miami Dade General Employees, made unsuccessful motions to intervene, although the Community Police Benevolent Association was allowed to participate as amicus curiae. Neither group appealed the denial of their motions to intervene
 
 
 [11]
 Fla.Stat.Ann. § 447.209 states:
 Public employer's rights
 It is the right of the public employer to determine unilaterally the purpose of each of its constituent agencies, set standards of services to be offered to the public, and exercise control and discretion over its organization and operations. It is also the right of the public employer to direct its employees, take disciplinary action for proper cause, and relieve its employees from duty because of lack of work or for other legitimate reasons. However, the exercise of such rights shall not preclude employees or their representatives from raising grievances, should decisions on the above matters have the practical consequence of violating the terms and conditions of any collective bargaining agreement in force or any civil or career service regulation.
 
 
 [12]
 The Palowitch and Indian River cases are both distinguishable from this case; neither case dealt with a city's power to amend an ordinance in light of a union's charge that such an amendment violated an existing collective bargaining agreement. Moreover, as noted above, civil service rules and regulations were excepted from Section 447.309(5)'s requirement that a collective bargaining agreement contain all terms and conditions of employment and neither case can be read as a limitation on that exception
 In Acker (which does not discuss Section 447.309), the court rejected the City of Jacksonville's argument that a police union was not entitled to the benefit of an ordinance that had been unilaterally changed by Jacksonville after a collective bargaining agreement was in effect. The court held that the agreement's savings clause (similar to the one in the FOP's agreement) did not freeze the public employees' benefits due under the law to those in existence at the time the collective bargaining agreement was negotiated. Thus the savings clause was not controlling and the union received the benefits under the new ordinance. In other words, Jacksonville's unilateral change of an ordinance affecting a prior agreement was not per se illegal.
 
 
 [13]
 Fla.Stat.Ann. § 166.021(4) provides in part:
 Powers
 The provisions of this section shall be so construed as to secure for municipalities the broad exercise of home rule powers granted by the Constitution.... nothing in this act shall be construed to permit any changes in a special law or municipal charter which affect the exercise of ... any rights of municipal employees, without approval by referendum of the electors as provided in s. 166.031.
 
 
 [14]
 On November 11, 1976, the Government and City filed a joint Statement of Uncontested Facts with the district court. Paragraph 7 provides:
 The City of Miami Civil Service Board utilizes competitive examinations in all hiring and promotion classifications, except for laborers, waste collectors, custodians and certain professional positions, and none of these examinations have been validated in accordance with EEOC Guidelines on Employee Selection Procedures, 29 C.F.R. §§ 1601 et seq., except for the validation study currently being conducted on examinations used by the Miami Police Department, by the City to ascertain if they are predictive of successful job performance.
 
 
 [15]
 See Cohen, et al. v. City of Miami, et al., (S.D.Fla.1972, Case No. 71-1887-Civ-CA)
 
 
 [16]
 In Fullilove v. Klutznick, 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), a majority of the Supreme Court affirmed a governmentally mandated 10% quota for minorities in the federal contracting area against a constitutional challenge because the quota was a temporary measure, remedial in purpose, flexible in administration, with a restricted adverse impact on non-minorities. The consent decree here clearly meets this constitutional standard, so that the City's implementation of the decree should withstand constitutional scrutiny
 
 
 [17]
 As the panel noted, all the injunction did was restrain the Unions from breaking the law. If the Unions were in doubt regarding the applicability of the decree's injunction as to them, they should have moved for a clarification of that injunction. See Adams v. Mathis, 614 F.2d 42 (5th Cir. 1980); 7 Moore's Federal Practice P 65.13 (2d ed. 1979)
 
 
 [18]
 This Court clearly had jurisdiction to hear this appeal as an order granting, continuing, or refusing to dissolve an injunction under 28 U.S.C.A. § 1292(a)(1). See Myers v. Gilman Paper Corp., 544 F.2d 837 (5th Cir.), cert. dismissed sub nom. International Brotherhood of Electrical Workers Local 741 v. Myers, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977); see also Carson v. American Brands, Inc., 450 U.S. 79, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981); United States v. Alexandria, supra, 614 F.2d at 1360-61