IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————

No. 99-50827
Summary Calendar

———————————

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BRIAN SCOTT SPRUILL,

Defendant-Appellant.

———————————

Appeal from the United States District Court
for the Western District of Texas

———————————

Before GARWOOD, BARKSDALE, and DEMOSS, Circuit Judges.

GARWOOD, Circuit Judge:

Defendant-appellant Brian Scott Spruill (Spruill) appeals his guilty plea conviction for violating 18 U.S.C. § 922(g)(8). Notwithstanding his plea agreement's waiver of appellate rights to challenge the conviction on grounds other than the Fifth and Second Amendments, we vacate and remand because the record clearly reflects and the district court found that the predicate court order was *not* "issued after a hearing of which such person received actual notice" as required by section 922(g)(8).

**Facts and Proceedings Below**

Spruill was charged in a two count indictment with violations of 18 U.S.C. § 922(g). Each count charged that Spruill on July 20, 1998 "did knowingly possess in and affecting commerce firearms[sic], to wit: a Largo, 9mm semi-automatic pistol, manufactured by Star, which had been shipped and transported in interstate commerce." Count one alleged that this possession violated section 922(g)(8) in that at the time Spruill was subject to a February 11, 1998 order of the County Court at Law of Midland County, Texas, issued after a hearing of which Spruill had notice and an opportunity to participate, which restrained him from harassing, stalking and threatening his intimate partner and her child and by its terms explicitly prohibits the use, attempted use, and threatened use of physical force against his intimate partner and her child. Count two alleged that this possession violated section 922(g)(3) in that Spruill "is an unlawful user of or addicted to a controlled substance."

Spruill filed a motion, and a second motion, to dismiss each count of the indictment on various grounds. The second motion was predicated on the district court's opinion in *USA v. Emerson*, 46 F.Supp.2d 589 (N.D. Tex. 1999) (which this court subsequently reversed, *USA v. Emerson*, 270 F.3d 203 (5th Cir. 2001)), and urged that sections 922(g)(8) and 922(g)(3) violated the Second and Fifth Amendments. The supporting memorandum filed with the second motion

2

to dismiss attached a copy of the February 11, 1998 order and alleged, *inter alia*:

> "Although the boilerplate order issued under these circumstances was signed by Judge Royal Hart, there was no evidentiary hearing about the circumstances leading to the issuance of said order and Defendant never appeared before said judge. Defendant was not represented by counsel and could not read the Protective Order presented to him. Mr. Spruill appeared before Assistant District Attorney David Watson, who represented the interest of the Petitioner in that matter, but, who nevertheless, explained the purpose of the Protective Order and at least some of its requirements to the Defendant. No mention about Defendant's ability to own, possess or lawfully use a weapon was made at that time and said Protective Order, while admonishing the Defendant about other prohibitions required by state law, does not mention any prohibition of weapon possession of any kind. The issuance of the Protective Order was a precursor to the filing of a Petition for Divorce in the state court."

> . . .

> ". . . the party potentially subject to the order may agree to be bound by said order without a hearing of record before a Judge, and without representation by an attorney. In the present case, there is no question that there was not a hearing before Judge Hart, that the defendant was not admonished with regard to his ability to possess a gun. Mr. Spruill appeared Pro Se, and was presented with a form order provided by the Midland County District Attorneys office where he was told 'where to sign,' if he did not oppose the motion by the State. (see Protective Order attached as exhibit "B").[1]

---

[1]The state court order is stamped as filed February 11, 1998, is entitled "Protective Order" and commences as follows:

> " On *11 [handwritten]* day of February, 1998, the Court heard the Application of REBECCA LEA SPRUILL, Applicant, for a Protective Order.

APPEARANCES

Applicant, REBECCA LEA SPRUILL, appeared in person and by

3

attorney and announced ready.

Respondent, BRIAN SCOTT SPRUILL, appeared in person and announced ready.

AGREED ORDER

The parties have agreed, as evidenced by their signatures and subject to the approval of the Court, to the terms and conditions set below, and such agreement shall be a part of this Protective Order.

JURISDICTION

The Court, having considered the pleadings and heard the evidence and argument of counsel, finds that all necessary prerequisites of the law have been satisfied and that this Court has jurisdiction over the parties and the subject matter of this cause.

FINDINGS AND ORDERS

The Court finds that Applicant and Respondent are husband and wife.
The Court finds that family violence has occurred and that family violence is likely to occur in the future.
The Court finds that Respondent, BRIAN SCOTT SPRUILL, has committed family violence. The Court finds that the following protective orders are for the safety and welfare and in the best interest of Applicant and other members of the family or household and are necessary for the prevention of family violence.
It is ORDERED that Respondent, BRIAN SCOTT SPRUILL, is prohibited from doing and/or required to do the following:

> PROHIBITED FROM COMMITTING FAMILY VIOLENCE. FAMILY VIOLENCE IS DEFINED IN SECTION 71.01(b)(2) OF THE TEXAS FAMILY CODE AS 'AN ACT BY A MEMBER OF A FAMILY OR HOUSEHOLD AGAINST ANOTHER MEMBER OF THE FAMILY OR HOUSEHOLD THAT IS INTENDED TO RESULT IN PHYSICAL HARM, BODILY INJURY, OR ASSAULT, OR THAT IS A THREAT THAT REASONABLY PLACES THE MEMBER IN FEAR OF IMMINENT PHYSICAL HARM, BODILY INJURY, ASSAULT, OR SEXUAL ASSAULT. . . .'

. . .

> ENGAGING IN CONDUCT DIRECTED SPECIFICALLY
> TOWARD A PERSON WHO IS A MEMBER OF THE FAMILY
> OR HOUSEHOLD, INCLUDING FOLLOWING THE PERSON,
> THAT IS REASONABLY LIKELY TO HARASS, ANNOY,
> ALARM, ABUSE, TORMENT, OR EMBARRASS THAT
> PERSON."

The order also specifies various other prohibitions, including directly communicating with the applicant "except through her divorce attorney, Tom Morgan". The last two prohibitions preclude Spruill from going within 200 yards of the family residence or his wife's place of employment or the children's schools.

The order then grants the wife exclusive possession of the residence, use and possession of various items of furniture, fixtures, appliances, personal effects and a particular motor vehicle, and provides that the order "is effective immediately" and will continue in force "through *11th [handwritten]* February 1999."

The order concludes "SIGNED the *11 [handwritten]* day of *Feb [handwritten]*, 1998" followed by the judge's signature and hand printed name.

There then appears a heading "WARNINGS" which states that, inter alia, any violation of the order is punishable by contempt (and otherwise), and concludes "NO PERSON, INCLUDING A PERSON WHO IS PROTECTED BY THIS ORDER, MAY GIVE PERMISSION TO ANYONE TO IGNORE OR VIOLATE ANY PROVISION OF THIS ORDER . . . UNLESS A COURT CHANGES THE ORDER."

There follows a signed signature line under which is typed "David Watson Assistant District Attorney." Below that there is the typed statement "Approved As To Form Only" followed by a signature line on which is handwritten "Pro Se" and below which is typed "Attorney for Respondent." Below that appears the typed statement "I have been given a copy of the protective order that has been filed in this cause. I hereby enter my appearance in this cause and waive the issuance and service of process." This is followed by two signature lines, one before the typed word "Respondent" and the other before the typed word "Applicant;" the latter is blank and the former bears Spruill's signature. There is no verification (or acknowledgment) of Spruill's signature. *Cf.* Tex. R. Civ. P., Rules 119 (waiver of issuance or service of process must be verified before a proper officer other than an attorney in the case and be accompanied by and acknowledge receipt of a copy of the petition); 120 ("enter an appearance in open court"); 121 (answer is appearance).

The order is seven pages long, the judge's signature appearing

5

The district court held a hearing on the motions to dismiss on May 7, 1999, and overruled them "without prejudice," stating "I'm going to give full consideration to the motion, but I'm going to do it only after a trial."

The case was subsequently set for a bench trial June 10, 1999. On that date the parties appeared before the court and defense counsel announced "subject to your approval, we have entered into this conditional plea and we would like to perfect the record by adducing evidence . . . we would like then to reurge the last Motion to Dismiss that we previously presented to the Court after we present that evidence."

Evidence was then presented. Assistant District Attorney Watson testified that his office handled protective orders for indigents (see Tex. Family Code § 82.002(d)(1)), and he had been the person assigned to do so for the previous two years. He brought with him the file in the Spruill protective order and "somewhat" remembered it. He stated that "Spruill came to the District Attorney's office, but I don't believe we ever entered a courtroom." He said he "believe[d]" Spruill "mentioned to me that he couldn't read," and indicated "he was going to agree to the

_____

on the sixth page, followed by the "Warnings," and the seventh page is that on which the signatures of Watson and Spruill appear.

The order does not purport to prohibit possession of a firearm or in any way state that such is its effect under state or federal law, and it is not suggested that the charged possession occurred in connection with or in relation to any violation or attempted violation of the order.

protective order." The practice of the District Attorney's Office was that the form order was prepared by the "staff;" "[i]f they're going to agree to it, discuss it with their attorney or with them, then we'll strike out certain things in the canned protective orders in the computer and add whether or not its agreed or contested or if there was pro se or whether or not an attorney was present." Spruill "agreed with this." As far as Watson knew, Spruill did so without "the benefit of a lawyer." Watson "read parts of it to him and explained what it meant and what the implications of the order would be." Watson "believe[d]" he "emphasized the fact that the only person that could allow him to go within 200 yards of the residence, its in the protective order, or go against any of the orders or protective order was the judge . . . that Ms. Spruill couldn't give him authority to come to the home or whatever", and stated "I believe I emphasized that. I recall sitting and talking with Mr. Spruill." Watson did not mention any other part of the order read or explained to Spruill. He further stated "I do recall Mr. Spruill, speaking with him, and the fact that he couldn't read was one thing that reminded me of it and I do attempt whenever there's an agreed protective order with a pro se individual to explain the protective order fairly thoroughly." Watson agreed that if one in Spruill's position had said he didn't want to sign or agree to the order, or wanted to see a lawyer or go see the judge about it "they would have been

7

provided an opportunity for that hearing." He also stated that "whenever I deal with a pro se respondent, I list the options they have available, representing themselves, hiring an attorney, agreeing to an order or default." Watson also testified:

> "I have a handwritten note in the file stating that we had contacted him and he was going to agree to the order, some of the conditions, to prepare the agreed order, and Mr. Spruill would come in and speak to me. When he came in exactly I don't recall the time or the exact date, but in routine practice whenever an agreed order is gone over, it's presented right then to the judge."

Spruill then testified. He responded "no, sir" when asked "can you read the English language well", and "yes, sir" when asked "you just can't read. Is that correct." He testified that before his wife filed for divorce he was called by the District Attorney's office and they "told me that they had a paper for me to come down . . . it was going to be a filing of a protective order on me," and "I told them I would come down and take care of that." He went to the District Attorney's office, talked with Watson there and "told him I would just like to go ahead and sign the order and get it over with." When asked if Watson told him that his signing the protective order would give up certain of his rights, Spruill responded "Yes, sir. He told me that-well, basically what he told me was that I wasn't supposed to be in so close of her or the school or her mother's house where she would be staying." He testified that he did not ever appear before a judge and that he did not then have an attorney. Spruill further testified that

8

Watson never told him, and he was unaware, that by virtue of the protective order he could not possess a handgun or weapon or that he needed to check federal statutes in that respect.[2]

The court was presented with the written plea agreement and attached written "Factual Basis" for it. The plea agreement provides Spruill would plead guilty to the section 922(g)(8) count (count one) and the remaining count (count two, section 922(g)(3)) would be dismissed, that the Government would not oppose maximum points for acceptance of responsibility or move for upward departure, and that Spruill waived the right to appeal his conviction and sentence:

> "except for the following two matters that were raised via pre-trial motion and overruled by the Court.[3] First, the Defendant may appeal the issue of whether 18 U.S.C. § 922(g)(8), taking into account the Protective Order at issue in this case (a true copy of which is part of the attached Factual Basis as Exhibit A thereto), violates the Second Amendment and other provisions of the United States Constitution as set forth in *United States v. Emerson*, No. 6:98-CR-103-C (N.D. Tex. March 30, 1998).

---

[2]Watson testified that at the time he was unaware of § 922(g)(8) and did not admonish Spruill in that connection, and that of the some five judges to whom he presented protective orders he could not recall that any "admonish[ed] anybody in court that they would be violating this statute or one like it if they possessed a firearm." The prosecution subsequently stated "we will freely stipulate that we do not have evidence that Mr. Spruill was aware of the existence of this law or that he specifically knew it was illegal under a protective order like this one, that it was illegal to possess a weapon." There was no evidence Spruill had ever signed (or saw) a BATF Form 4473 (or similar document) so advising.

[3]The motions to dismiss were not actually overruled until August 13, 1999, though at the June 10, 1999 hearing the district court indicated that would likely be its ruling.

9

Second, the Defendant may appeal the issue of whether 18 U.S.C. § 922(g)(8), given the Government's stipulation (set forth in the Factual Basis) that it cannot prove beyond a reasonable doubt that Defendant was aware that he could not legally possess a weapon, violates the Fifth Amendment to the United States Constitution."[4]

The Factual Basis states that the February 11, 1998 order was entered that date and was still in effect on July 20, 1998, it attaches and incorporates a true copy of the entire order, and also summarizes some of its provisions. It goes on to recite that on July 20, 1998 Spruill, in the parking lot of a restaurant in Midland, Texas, got out of his car and carried the 9mm Largo semi-automatic pistol, which was unloaded, from his car to the car of a "reporting individual," and was then arrested.[5] It is stated that this pistol "was manufactured in Spain, and so necessarily would have had to have been shipped or transported in interstate and foreign commerce to have arrived in Texas," and that "DPS tests indicate that this weapon was operational."

With respect to how the protective order came about, the Factual Basis recites

_____

[4]The agreement also said it did not preclude challenge to the conviction or sentence for ineffective assistance of counsel or certain prosecutorial misconduct.

[5]The Factual Basis further recites that the "reporting individual" had previously traded the Largo to Spruill for another pistol and on July 17, 1998, in a consensually recorded telephone call monitored by the DPS, had offered to trade the other pistol back to Spruill in exchange for the Largo and resolution of an outstanding debt between the two, Spruill had agreed, and the two were to meet at the restaurant July 20, 1998 to effectuate the transaction. In this July 17, 1998 conversation "officers heard Spruill state an intention to shoot Rebecca Lea Spruill."

10

"Defendant appeared before the Court when this Protective Order was issued, and had the opportunity to be heard on the matter. Indeed, Defendant signed the Protective Order acknowledging his receipt of it, and agreed to its terms."

Based on the earlier testimony at the hearing, the Government and defense counsel agreed, and stated in open court, that the first sentence in the above quoted passage would be changed to read (after "Defendant") "came to the District Attorney's office and agreed to the order and he had the opportunity to be heard on this matter had he chosen to." Later in the hearing the district court ascertained from Spruill that he agreed to this change, the court explaining it to him as follows: "There's a little bit of a change in the factual basis and the change is that you didn't go to court before a judge, that you just signed the protective order in Mr. Watson's presence and then left." After going over the plea agreement and factual basis and questioning and advising Spruill and counsel pursuant to Rule 11, Fed. R. Crim. Pro., the district court accepted the plea and found Spruill guilty of the offense "subject to my final decision on the issue of constitutionality."[6]

On August 13, 1999, the district court issued its opinion and order overruling Spruill's motion to dismiss the indictment. *U.S. v. Spruill*, 61 F.Supp.2d 587 (W.D. Tex. 1999). Concerning the protective order, the opinion states in relevant part:

---

[6]The court found the plea "a knowing and voluntary plea supported by an independent basis in fact containing each of the essential elements of the offense."

11

"The Defendant informed the ADA that he would agree to the entry of the order. Based on that representation, the ADA printed a standard restraining order and invited the Defendant to come sign that order. The Defendant came in to the ADA's office for that purpose. The Defendant informed the ADA that he could not read. The ADA explained the restraining order to the Defendant. In particular, the ADA informed the Defendant that he could not go within a set distance of his spouse, children or mother-in-law's home. The ADA did not inform the Defendant that, upon entry of the order, the Defendant would not be able to possess a firearm. The ADA was not aware of this federal law and has never heard a party admonished to that effect in over one hundred protective orders he has handled.

The ADA also explained to the Defendant that he could choose to hire counsel, object to the entry of the order, and appear before a state court judge. The Defendant stated that he would agree to the order, signed the order, and left. Although the language in this protective order states that the Defendant appeared in person, the *Defendant never appeared before a judge, nor was a hearing (at least as this Court would define one) apparently ever held.* Despite this, the order purported to find that family violence had occurred. This language, however, was contained in the proposed order which the Defendant signed without protest and the Defendant did have the *opportunity* to participate in a hearing, thus satisfying any procedural due process concerns." *Id.* at 588 (emphasis added).[7]

---

[7]The district court also stated that "[d]efendant's wife filed for a divorce and a restraining order" and that "[t]he Assistant District Attorney . . . contacted the Defendant to notify him of the application for a restraining order and a hearing to be held on same." *Id.* We note, however, that there is no evidence a divorce had *actually* been filed (as opposed to about to be filed) before Spruill signed the Protective Order, that Spruill testified this was "[p]rior to her filing for a divorce", and that the memorandum in support of the motion to dismiss alleges that "[t]he issuance of the Protective Order was a precursor to the filing of a Petition for Divorce." There is no evidence that any hearing was ever set or that Spruill was ever notified of any such setting; nor is there any evidence that a restraining order–as distinguished from a protective order–was ever requested or involved, or that there was then or ever any written application for either; nor is there any

12

The district court subsequently sentenced Spruill to twenty-one months' confinement and three years' supervised release.

Spruill timely brought this appeal.[8]  In his initial brief as appellant Spruill urged that the application to him of section 922(g)(8) violated his rights under the Fifth and Second Amendments, relying on the district court opinion in *United States v. Emerson*, 46 F.Supp.2d 598 (N.D. Tex. 1999).  The Government in appellee's brief urged that section 922(g)(8) was constitutional facially and as applied.  We held Spruill's appeal in abeyance pending our resolution of the Government's appeal in *Emerson*.  After issuance of our decision in that appeal, *United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001), we requested the parties to each file a supplemental brief addressing the following questions, viz:

> "(1) Does the evidence at the Rule 11 hearing, as well as the facts found by the district court in its order dated

---

evidence that before coming to the District Attorney's office Spruill had been contacted or called by an Assistant District Attorney, as opposed to someone else from that office.  We also note that the Protective Order is not styled as a divorce action would be (Tex. Family Code § 6.401(a) states "Pleadings in a suit for divorce or annulment shall be styled 'In the Matter of the Marriage of _____ and _____'") but rather as appropriate for an independent Protective Order proceeding under Chapter 85 of the Texas Family Code (the Protective Order is styled "In the Matter Of Rebecca Lea Spruill, Applicant And Brian Scott Spruill, Respondent And In the Interest of Minor Children Kelsee West Shelby West").

[8]Because he had been in pre-trial confinement since July 1998 Spruill had served his entire confinement sentence by the time he filed his initial brief as appellant in this Court.

August 13, 1999, reflect that the predicate state court order alleged in count one of the indictment was not 'issued after a hearing' as provided in 18 U.S.C. § 922(g)(8)(A):

(2) If so, did the district court err in accepting the plea of guilty to count one, and should this court vacate the conviction?"

In his supplemental brief, Spruill contends that each such question should be answered in the affirmative, and that his conviction should accordingly be vacated. The Government argues that as Spruill had, but waived, an opportunity to appear before the state judge and present evidence, any "hearing" requirement of section 922(g)(8) was satisfied, and that in any event that issue is not within any exception to the waiver of appeal in Spruill's plea agreement.

## Discussion

We turn to the issues addressed in the supplemental briefing, namely: (1) whether the evidence at the Rule 11 hearing and the facts found by the district court reflect that the predicate February 11, 1998 order was without the scope of section 922(g)(8) because it was not "issued after a hearing of which such person received actual notice" as required by section 922(g)(8)(A);[9] and

_____

[9]Section 922(g)(8) provides:

"(g) It shall be unlawful for any person–
 . . .
    (8) who is subject to a court order that–
       (A) was issued after a hearing of
       which such person received actual
       notice, and at which such person had

14

(2) if so, whether the trial court erred by accepting Spruill's guilty plea and whether this court should accordingly vacate his conviction.

1. Initially addressing the second issue, it is undisputed that *if* the February 11, 1998 order is not within the class of orders embraced in paragraph (A) of section 922(g)(8) that Spruill's possession of the firearm did not constitute a violation of section 922(g)(8). Accordingly, *if* the facts as shown at the Rule 11 hearing, and as found by the district court, do not reflect that the order was within the scope of paragraph (A) of section 922(g)(8), then it is clear the district court should not have

> an opportunity to participate;
> (B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and
> (C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or
> (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury;
> . . .
>
> to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce."

15

accepted the guilty plea. As we said in *United States v. Johnson*, 194 F.3d 657, 659 (5th Cir. 1999), *vacated and remanded*, 120 S.Ct. 2193 (2000), *prior opinion reinstated with modification*, 246 F.3d 749 (5th Cir. 2001):

> "A trial court cannot enter judgment on a plea of guilty unless it is satisfied that there is a factual basis for the plea. *See* Fed. R. Crim. P. 11(f). 'The purpose underlying this rule is to protect a defendant who may plead with an understanding of the nature of the charge, but "without realizing that his conduct does not actually fall within the definition of the crime charged."' *United States v. Oberski*, 734 F.2d 1030, 1031 (5th Cir. 1984) (quoting *United States v. Johnson*, 546 F.2d 1225, 1226–27 (5th Cir. 1977)). This factual basis must appear in the record and must be sufficiently specific to allow the court to determine that the defendant's conduct was 'within the ambit of that defined as criminal.' *Id.*"

The fact that Spruill's guilty plea reserved only the constitutional issues, and not whether the defendant's conduct constituted an offense under the statute, neither lessens the foregoing Rule 11(f) requirement nor precludes reversal on appeal for failure to meet it. Thus, in *Johnson*, although we opined that the defendant, charged with arson under 18 U.S.C. § 844(i), had, by unconditionally pleading guilty, "waived his as-applied constitutional challenge to § 844(i)", *id*. at 659, we nevertheless vacated the conviction "[b]ecause the factual basis presented to the district court fails to establish the interstate commerce element of 18 U.S.C. § 844(i)." *Id*. at 662-63. We reaffirmed our opinion and holding in this respect on remand from the Supreme Court and also held that vacation was additionally required because

16

"the factual basis for the plea as shown by the record likewise does not suffice" to establish that the burned "building was being actively employed for commercial purposes so as to be within the terms of section 844(i)." *Johnson*, 246 F.3d at 752. *See also United States v. White*, 258 F.3d 374, 380 (5th Cir. 2001) ("notwithstanding an unconditional plea of guilty, we will reverse on direct appeal where the factual basis for the plea as shown of record fails to establish an element of the offense of conviction").[10]

Nor do we conclude that review at this stage is barred by the waiver of appeal provisions in Spruill's plea agreement. In *White* we noted that a similar appeal waiver–as here, of issues not raised in this motion to dismiss the indictment–was "insufficient to accomplish an intelligent waiver of the right not to prosecuted (and imprisoned) for conduct that does not violate the law" and "[w]e reject[ed] the government's waiver argument, especially since failure to do so risks depriving a person of his liberty for conduct that does not constitute an offense." *Id*. at 380. We are cited to no opinion of this court which has enforced such an appeal waiver in analogous circumstances.

---

[10]The fact that the particular factual and legal scenario here presented does not appear to have been addressed in any other reported opinion does not preclude the asserted error in this respect from being sufficiently clear or plain to authorize vacation of the conviction on direct appeal. The factual and legal scenarios in *Johnson* and *White* were each at least as novel.

17

2. Accordingly, it is appropriate for us to rule on the first issue presented in the supplemental briefing, essentially whether the predicate February 11, 1998 order was not "issued after a hearing of which such person received actual notice", and was hence not within the scope of section 922(g)(8)(A).

As the government recognizes, "[t]he term 'hearing' in its legal context undoubtedly has a host of meanings." *United States v. Florida East Coast Railway Company*, 93 S.Ct. 810, 818 (1973). The same general thought is reflected in *United States v. Tannehill*, 49 F.3d 1049, 1053 (5th Cir. 1995), where, addressing the meaning of the term "hearing" in the Speedy Trial Act, we stated:

> "The Act does not define what constitutes a 'hearing', . . . In other contexts, 'hearing' has been defined in various ways. *See, e.g., Buxton v. Lynaugh*, 879 F.2d 140, 144-45 (5th Cir. 1989) ('hearing', as used in habeas corpus statute, 28 U.S.C. § 2254(d), 'does not necessarily require an evidentiary hearing and . . . factfinding based on a record can in some circumstances be adequate'), *cert. denied*, 497 U.S. 1031, 110 S.Ct. 3295, 111 L.Ed.2d 803 (1990); *State v. Orris*, 26 Ohio App.2d 87, 269 N.E.2d 623, 624 (1971) (the term 'hearing' suggests 'to "give audience to"'); *Black's Law Dictionary* 721 (6th ed. 1990) (defining 'hearing' as '[a] proceeding of relative formality (though generally less formal than a trial), generally public, with definite issues of fact or law to be tried, in which witnesses are heard and evidence presented')."[11]

---

[11]With respect to this *Black's Law Dictionary* definition, *see also Willimatic Car Wash Inc. v. Zoning Board*, 247 Conn. 732, 724 A2d 1108, 1110 (1999):

> "Section 8-8(N) does not specify the nature of the hearing that it requires. We begin, therefore, by

18

Similarly, "hearing" is not defined in 18 U.S.C. § 921(a) (defining terms for purposes of chapter 44) or in chapter 1 of Title 18.

It is evident from the record, the district court's findings and the "Agreed Order" recitals in the protective order (see note 1 *supra*), that that order was issued as an "Agreed Order" pursuant to section 85.005 of the Texas Family Code,[12] without process having been issued or served, without any time or place for hearing having

---

considering the term 'hearing' according to its common, generally understood meaning. [citation]. We consistently have acknowledged the definition of a hearing provided in Black's Law Dictionary, as '[a] proceeding of relative formality . . . generally public, with definite issues of fact or of law to be tried, in which witnesses are heard and evidence presented' . . ."

[12]Section 85.005 provides as follows:

"**§ 85.005. Agreed Order**

(a) To facilitate settlement, the parties to a proceeding may agree in writing to the terms of a protective order as provided by Section 85.021. An agreement under this subsection is subject to the approval of the court.
(b) To facilitate settlement, a respondent may agree in writing to the terms of a protective order as provided by Section 85.002, subject to the approval of the court. The court may not approve an agreement that requires the applicant to do or refrain from doing an act under Section 85.022.
(c) If the court approves an agreement between the parties, the court shall render an agreed protective order that is in the best interest of the applicant, the family or household, or a member of the family or household.
(d) An agreed protective order is not enforceable as a contract.
(e) An agreed protective order expires on the date the court order expires."

19

previously been set, and, thus necessarily, without any notice of hearing having been issued or been received by Spruill, without Spruill ever appearing before the judge, without any presentation of evidence to the judge and without any hearing. The special procedure contemplated by section 85.005 is in contrast to those required in the Texas Family Code provisions for other protective orders, which require issuance and service of notice of the application, sections 82.042, 82.043, that the court set a date and time for hearing, section 84.001, that the notice of application show the date, time and place of the hearing, section 82.041, that "[a]t the close of a hearing" the court "shall" make findings as to whether family violence had occurred and is likely to occur in the future and, if so, "shall render a protective order," section 85.001, and that a protective order may be issued "on a respondent who does not attend a hearing if the respondent received service of the application and notice of the hearing." Section 85.006.[13] Here no hearing was ever set and Spruill received no notice of any hearing.

---

[13]There are also procedures for temporary "ex parte" protective orders which may be issued "without further notice to" the respondent "and without a hearing" if "the court finds from the information contained in an application . . . that there is a clear and present danger of family violence," § 83.001, such orders to remain in effect "not to exceed 20 days," subject to being "extended for additional 20 day periods." § 83.002. The order in question here is obviously not such an order (and such orders are clearly not within § 922(g)(8)(A), *see United States v. Emerson*, 270 F.3d 203, 211 n.2 (5th Cir. 2000)).

20

Significantly, the court's approval of the order agreed to out of court by Spruill under section 85.005 "to facilitate settlement" clearly does not carry with it the same degree of assurance that the issuing court itself determined that such an order was necessary to prevent family violence as would an order issued after an actual hearing. In *Emerson* we noted Second Amendment concerns respecting section 922(g)(8), but concluded that where the state law and procedures were such that the order should not issue unless the issuing court actually concluded that absent the order there was a realistic threat of imminent physical injury to the protected party, such concerns were not controlling, for "[i]n such a case, we conclude that the nexus between firearm possession by the party so enjoined and the threat of lawless violence, is sufficient, though likely barely so, to support the deprivation, while the order remains in effect, of the enjoined party's Second Amendment right to keep and bear arms." *Id.* at 264. Where the court, without any setting or hearing and without the parties being before it, merely approves and issues an order because the parties have agreed to it "to facilitate settlement" and it "is in the best interest of the applicant, the family or household, or a member of the family or household" (section 85.005), there would be a real question as to whether the requisite nexus has been established. As the court explained in *Janus Films Inc. v. Miller*, 801 F.2d 578, 583 (2d Cir. 1986):

21

". . . With a true 'consent judgment' all of the relief to be provided by the judgment and all of the wording to effectuate that relief is agreed to by the parties. *The court makes no determination of the merits of the controversy or of the relief to be awarded.* With a 'settlement judgment' the parties have agreed on the components of a judgment, including the basis aspects of relief, but have not agreed on all the details or the wording of the judgment. The components of the agreement are usually reported to the court on the record. *As with a consent judgment, the judge makes no determination of the merits of the controversy.* With respect to relief, however, the judge's role in a settlement judgment is slightly broader. Since the parties have agreed only upon the basic aspect of relief, the judge is obliged to determine the detailed terms of the relief and the wording of the judgment. In determining the details of relief, the judge may not award whatever relief would have been appropriate after an adjudication on the merits, but only those precise forms of relief that are either agreed to by the parties . . . or fairly implied by their agreement.

. . .

In deciding whether to approve agreements calling for entry of either a consent judgment or a settlement judgment, *a court normally has only a limited role* so long as the dispute affects only private interests. *See United States v. City of Miami*, 614 F.2d 1322, 1330 (5th Cir. 1980). *Though the judge does not 'merely sign on the line,' United States v. City of Miami*, 664 F.2d 435, 440 (5th Cir. 1981), *he or she normally makes only the minimal determination of whether the agreement is appropriate to be accorded the status of a judicially enforceable decree.*" (Emphasis added)

Similarly, in *Commonwealth v. Davis*, 531 Pa. 272, 612 A2d 426, 429

(1992), the court stated:

"We have held in the past, and we do so again, that a hearing intends a judgment bench attended by judges or officials sitting in a judicial capacity, prepared to listen to both sides of the dispute and to *consider deeply*, reflect broadly, and decide impartially, and *the mere consideration of a report moving across one's desk,*

22

*is not a hearing."*

*See also, e.g., Willimatic Car Wash, Inc. supra*, 724 A.2d at 1113-
14 (announcement of zoning appeal settlement at pretrial
conferences before court, with court ascertaining that all agreed,
and subsequent enforcement evidentiary hearing, did not meet
requirement of a statute requiring that court action on zoning
appeal be "after a hearing").

The district court held that the entry of the February 11,
1998 order did not deny Spruill procedural due process because he
did not have to sign and consent to it and had he not done so a
hearing would have been set and he would have had notice thereof
and an opportunity to participate and present evidence. 61 F.Supp.
at 588.[14] But the issue we address is not whether the state court

---

[14]The district court cited in this connection *United States v.
Falzone*, 1998 W.L. 351471 (D. Conn. 1998), a § 922(g)(8)
prosecution in which the defendant did *not* claim that the predicate
state court order was issued without a hearing, or that he did not
have adequate notice of the hearing, but rather that "he did not
receive an opportunity to participate in the state court hearing at
the conclusion of which the protection order was issued against
him." The defendant appeared in person and with his lawyer at the
hearing, and his lawyer "had the opportunity to raise objections to
the entry of the protective order." The only contention in the
federal prosecution was that defendant had had inadequate time to
consult with his lawyer prior to the latter's "'snap' decision not
to contest the entry of the protective order." It is evident that
no request for a recess or continuance was made in the state
proceedings, and the district court found that the lawyer's action
"was certainly reasonable." It concluded that the protective order
hearing was one "at which" the defendant "had an opportunity to
participate" within the meaning of § 922(g)(8)(A), and that the
entry of the protective order did not violate defendant's
procedural due process rights. Here, however, there was no hearing
and no notice of hearing, Spruill did not appear before the court

23

order was itself valid or its terms enforceable against Spruill-that order does not address firearm possession by Spruill and his possession of the firearm did not violate the order. Rather, the relevant issue is whether the protective order here-issued under section 85.005 without any prior setting or hearing and without the parties being before it-is within the scope of section 922(g)(8)(A)'s requirement that the order have been "issued after a hearing of which such person received actual notice." Obviously, the mere fact that the protective order may itself be enforced without violating the respondent's procedural due process rights does not mean that it is within the scope of section 922(g)(8)(A). For example, *once* a respondent receives proper notice of a temporary protective order against him that has been issued without prior notice to him, *that* order can, consistent with due process, thereafter be enforced against him even though he had no notice prior to its entry. Yet such an order is plainly *outside* the scope of section 922(g)(8)(A). We believe that section 922(g)(8)(A) is best understood as not directed only to procedural due process concerns but as well to the concept that federal legislation should not affix to state court domestic relation protective orders the collateral effect of imposing serious federal felony penalties for conduct not violative of the order itself or otherwise illegal, *unless* a judge has conscientiously indeed

---

and was not represented by counsel.

24

concluded, after an actual hearing, that such was reasonably necessary to prevent otherwise likely conduct as described in section 922(g)(8)(B) and (C), *as opposed* to the judge merely approving without an actual hearing an order agreed to by parties out of court "to facilitate settlement," a process in which, as stated in *Janus Films, supra*, the judge "normally has only a limited role," generally "makes no determination of the merits," and "normally makes only the minimal determination of whether the agreement is appropriate to be accorded the status of a judicially enforceable decree."

The government urges that "hearing" as used in section 922(g)(8)(A) means "an opportunity to be heard, to present one's side of the case, or to be generally known or appreciated," one of the definitions given in *Webster's Collegiate Dictionary* 535 (10th ed. 1996).[15] We decline to adopt this definition. For the reasons

---

[15]This definition is cited in *United States v. Wilson*, 159 F.3d 280, 292 (7th Cir. 1998), in connection with the court's rejection of the contention in a § 922(g)(8) prosecution that the trial court erred by refusing defendant's two requested instructions which stated that "a hearing includes a defendant's right to be heard at a meaningful time and in a meaningful manner" and that "an opportunity to participate at a hearing includes the defendant's right to a fair and meaningful opportunity to present his defense," the Seventh Circuit concluding that these instructions were adequately covered in the court's charge which required the jury to find that "[t]he Order of Protection was issued after a hearing of which defendant received actual notice" and that "[d]efendant had an opportunity to participate at said hearing." *Id*. at 291. Wilson, the defendant in that case, also contended that he was entitled to acquittal "because the hearing he was given [on the protective order] did not meet the requirements of the Due Process Clause," but the Seventh Circuit rejected that contention. *Id.* at

25

stated, and particularly as applied in this case, it would not address the hearing concerns which we believe are implicit in section 922(g)(8)(A), and might well raise serious Second Amendment issues. Moreover, the government's proffered definition is obviously not directed primarily at judicial (or even quasi-judicial) proceedings but extends as much to purely social or other non-governmental situations (e.g., "to be generally known or appreciated"). In *Florida East Coast Railway* the Supreme Court

---

289-90. Its recital of the facts reflects that Wilson's wife (or former wife) had obtained an ex parte emergency protective order against Wilson and this was served on Wilson, the order stating that a hearing would be held on a plenary protection order on September 1, at 1 p.m., and thereafter Wilson, his wife and her attorney appeared in court on that day and time. Wilson, *pro se*, then filed a motion to vacate a default dissolution of marriage previously entered by the judge, Hill, and a motion for Judge Hill to recuse himself. Both motions were granted "and Judge David Correll took over the case. Wilson, Thomas [the wife's lawyer] and Judge Correll then retired to Judge Correll's chambers for the scheduled hearing on the entry of a plenary order of protection . . . against Wilson while Angela [the wife] and Wilson's mother . . . waited outside." The "meeting in Judge Correll's chambers lasted no more than ten minutes. During the meeting, Judge Correll explained the proposed order of protection to Wilson, who indicated he did not have a problem with any of its terms." *Id.* at 284. In rejecting the "Due Process" challenge to the order, the Seventh Circuit stated that "Wilson had notice of the hearing that took place on September 1," that he was afforded an "opportunity at the hearing" before Judge Correll to present reasons why the order should not issue, and "that Wilson, although proceeding *pro se* at the time, had successfully persuaded another judge to vacate a default divorce that had been entered and then recuse himself from the case. Wilson was thus competent to lodge an objection to the protective order, and he was given the ability to do so. This is all that due process requires . . ." *Id.* at 290. We note in passing the contrasts to Spruill's case, in which no hearing was set, given notice of, or held, there was no appearance before the judge, and the order was explained to the illiterate Spruill by the protected party's attorney.

26

gave "a broad definition of the term 'hearing'", which did not include the right to present evidence orally, cross-examine witnesses or present oral argument, because "the term was used in granting authority to the Commission to make rules and regulations of a prospective nature" (*id*. 93 S.Ct. at 818-19) which were of a general character applicable to numerous parties (*id*. at 820). The Court there specifically distinguished other of its decisions as to what constituted a "hearing" on the basis that they involved "'quasi-judicial' proceedings." *Id*. at 819, 820. Here, section 922(g)(8)(A) is plainly directed to judicial proceedings, pointing to a narrower, rather than a broader, meaning of "hearing." Further, the government's suggested definition of hearing would in essence have section 922(g)(8)(A) say that an opportunity for a noticed hearing must have been afforded, or that the order be one that was issued after the person had been afforded the opportunity to be heard on actual notice with right to participate. But, that is not what section 922(g)(8)(A) says. What section 922(g)(8)(A) *actually* says is that the order must be one "issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate." The ordinary, natural meaning of this is that there must have been an actual hearing–as we said in *Emerson*, 270 F.3d at 261, and as the district court stated here ("[d]efendant never appeared before a judge, nor was a hearing (at least as this court would define one) apparently ever

27

held," 61 F.Supp.2d at 588). *See also Willimatic Car Wash, Inc.*, 724 A2d at 1110, as to the "common, generally understood meaning" of "hearing" (quoted in note 11 *supra*). Moreover, the wording of section 922(g)(8)(A) likewise expressly requires that the defendant have "received actual notice" of the hearing, which necessarily means that the hearing must have been set for a particular time and place and the defendant must have received notice of that and thereafter the hearing must have been held at that time and place. None of these things occurred here.

In construing section 922(g)(8)(A) we are likewise influenced by two other considerations to give it a narrower rather than a broader scope. First, the scope of a criminal statute, unless it is clear and unambiguous (an attribute the government does not claim for section 922(g)(8)(A)), is to be strictly, and not expansively, construed. *See Jones v. United States*, 120 S.Ct. 1904, 1912 (2000).[16] A narrower, rather than a broader, construction of section 922(g)(8)(A) is likewise indicated because

---

[16]In *Jones* the Court stated:

"We have instructed that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity,' *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971), and that 'when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite," *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 221-22, 73 S.Ct. 227, 97 L.Ed. 260 (1952)." *Id*.

that enactment affixes to state court domestic relations orders the collateral effect of imposing serious federal felony penalties for conduct not violative of the order itself or otherwise illegal (indeed even for conduct which the order might expressly authorize), and hence intrudes into the regulation of domestic relations and court orders related thereto that are paradigmatic areas of state concern and control, all with only the most remote and attenuated relation to interstate commerce.  To avoid expanding that intrusion the class of orders covered by section 922(g)(8)(A) should be narrowly, not broadly, construed under the principle that "unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance." *United States v. Bass*, 92 S.Ct. 515, 523 (1971).  *See also Jones* at 1912 (quoting *Bass* in this respect).

For the foregoing reasons, we conclude that the February 11, 1998 order was not one entered "after a hearing of which" Spruill "received actual notice" and accordingly was not within the scope of section 922(g)(8).

The judgment of conviction is therefore vacated and the cause is remanded for proceedings consistent herewith.

VACATED and REMANDED